UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PRIORITIES USA, *et al.*,                                    Case No. 19-13341

      Plaintiffs                                              Stephanie Dawkins Davis
v.                                                          United States District Judge

DANA NESSEL,

      Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND
## DENYING IN PART MOTION TO DISMISS (ECF No. 29)

## I.    PROCEDURAL HISTORY

Plaintiff, Priorities USA, originally filed this action challenging two

Michigan statutes, one governing the absentee ballot process in Michigan and the

other governing transportation to polling places. (ECF No. 1). Defendant,

Michigan Attorney General Dana Nessel, moved to dismiss the complaint on

December 20, 2019. (ECF No. 10). Shortly, thereafter, District Judge Marc A.

Goldsmith, to whom this matter was previously assigned, entered an order

allowing Priorities to file an amended complaint to address the issues raised in the

motion to dismiss. (ECF No. 13). On January 27, 2020, plaintiffs filed an

amended complaint, adding two additional plaintiffs, Rise, Inc. and

Detroit/Downriver Chapter of the A. Philip Randolph Institute (DAPRI). (ECF

No. 17). Defendant filed a motion to dismiss the amended complaint on February

10, 2020.  (ECF No. 27).  This matter is fully briefed.  (ECF Nos. 40, 44).  The Court held a hearing via video, pursuant to notice, on May 8, 2020.  (ECF No. 56).

For the reasons set forth below, defendant's motion to dismiss the amended complaint is **GRANTED** in part and **DENIED** in part.  Counts III and VII are **DISMISSED** and all remaining counts are left intact.

## II.     FACTUAL BACKGROUND AND THE AMENDED COMPLAINT

Priorities is a 501(c)(4) nonprofit corporation and a "voter-centric progressive advocacy and service organization."  (ECF No. 17, PageID.92, ¶ 7). Its "mission is to build a permanent infrastructure to engage Americans by persuading and mobilizing citizens around issues and elections that affect their lives."  *Id*.  It engages in activity to "educate, mobilize, and turn out voters" in Michigan, and states that it "expects to" make expenditures and contributions towards those objectives in upcoming Michigan state and federal elections.  *Id*.

Rise is also a 501(c)(4) nonprofit organization that "runs statewide advocacy and voter mobilization programs in Michigan and California, as well on a number of campuses nationwide."  (ECF No. 17, PageID.93, ¶ 8).  Rise claims that "efforts to empower and mobilize students as participants in the political process ... are critical to Rise's mission because building political power within the student population is a necessary condition to achieving its policy goals."  *Id*.  Rise launched its second state-specific campaign in Michigan in 2019, and says it has

eleven student organizers who are paid to organize their campuses including voter education and turnout activities.  Rise plans to continue this program through the 2020 elections.  *Id*. at 9.  This effort has included and will continue to include engaging their fellow students in grassroots voter education, registration, and turnout activities, including on-campus, get-out-the-vote drives and canvasses.  *Id.*

DAPRI is a local chapter of a national 501(c)(3) nonprofit organization.  It is a membership organization "with a mission to continue to fight for Human Equality and Economic Justice and to seek structural changes through the American democratic process."  (ECF No. 17, PageID.95, ¶ 14).  It has members who are "involved in voter registration, get-out-the-vote activities, political and community education, lobbying, legislative action, and labor support activities in Michigan.  *Id*.  DAPRI's members have "provided rides" to and from the polls for the community on election day and intends to continue to do so and to expand this work in future elections.  *Id*. at ¶ 16.  DAPRI acknowledges that Proposal 3 makes absentee voting available to all, and says that it would like to educate voters about the opportunity to vote absentee.  (ECF No. 17, PageID.96, ¶ 17).

The Absentee Ballot Law provides that, in order to receive an AV ballot, a voter must request an application and submit that application to the voter's local clerk.  For both primaries and regular elections, an elector may apply for an AV ballot at any time during the 75 days preceding the primary or election.  Mich.

Comp. Laws § 168.759(1)-(2).  In both cases, "the elector shall apply in person or by mail with the clerk" of the township or city in which the elector is registered.

*Id*.  Subsection 759(3) provides that:

> (3) An application for an absent voter ballot under this section may be made in any of the following ways:
>
>> (a) By a written request signed by the voter.
>>
>> (b) On an absent voter ballot application form provided for that purpose by the clerk of the city or township.
>>
>> (c) On a federal postcard application.
>
> (4) An applicant for an absent voter ballot shall sign the application. A clerk or assistant clerk shall not deliver an absent voter ballot to an applicant who does not sign the application. A person shall not be in possession of a signed absent voter ballot application except for the applicant; a member of the applicant's immediate family; a person residing in the applicant's household; a person whose job normally includes the handling of mail, but only during the course of his or her employment; a registered elector requested by the applicant to return the application; or a clerk, assistant of the clerk, or other authorized election official. A registered elector who is requested by the applicant to return his or her absent voter ballot application shall sign the certificate on the absent voter ballot application.
>
> (5) The clerk of a city or township shall have absent voter ballot application forms available in the clerk's office at all times and shall furnish an absent voter ballot application form to anyone upon a verbal or written request.

Mich. Comp. Laws §§ 168.759(3)-(5)

4

Where a form application is used, under § 759(5), the "application shall be in substantially the following form," which then provides the body of the form and includes a general "warning" and a "certificate" portion for "a registered elector" delivering a completed application for a voter.  Mich. Comp. Laws § 168.759(5). The warning must state that:

> It is a violation of Michigan election law for a person other than those listed in the instructions to return, offer to return, agree to return, or solicit to return your absent voter ballot application to the clerk.  An assistant authorized by the clerk who receives absent voter ballot applications at a location other than the clerk's office must have credentials signed by the clerk. Ask to see his or her credentials before entrusting your application with a person claiming to have the clerk's authorization to return your application.

*Id*.

Similarly, the certificate for a registered elector returning an AV ballot application must state that:

> I am delivering the absent voter ballot application of [the named voter] at his or her request; that I did not solicit or request to return the application; that I have not made any markings on the application; that I have not altered the application in any way; that I have not influenced the applicant; and that I am aware that a false statement in this certificate is a violation of Michigan election law.

*Id*.

Under § 759(6), the application form must include the following instructions for an applicant:

Step 1. After completely filling out the application, sign and date the application in the place designated. Your signature must appear on the application or you will not receive an absent voter ballot.

Step 2. Deliver the application by 1 of the following methods:

(a) Place the application in an envelope addressed to the appropriate clerk and place the necessary postage upon the return envelope and deposit it in the United States mail or with another public postal service, express mail service, parcel post service, or common carrier.

(b) Deliver the application personally to the clerk's office, to the clerk, or to an authorized assistant of the clerk.

(c) In either (a) or (b), a member of the immediate family of the voter including a father-in-law, mother-in-law, brother-in-law, sister-in-law, son-in-law, daughter-in-law, grandparent, or grandchild or a person residing in the voter's household may mail or deliver the application to the clerk for the applicant.

(d) If an applicant cannot return the application in any of the above methods, the applicant may select any registered elector to return the application. The person returning the application must sign and return the certificate at the bottom of the application.

Mich. Comp. Laws § 168.759(6).

Consistent with these statutes, § 759(8) provides that "[a] person who is not authorized in this act and who both distributes absent voter ballot applications to absent voters and returns those absent voter ballot applications to a clerk or assistant of the clerk is guilty of a misdemeanor." Mich. Comp Laws

§ 168.759(8).  Section 931 also provides for penalties associated with distributing and returning AV ballot applications.  *See* Mich. Comp. Laws §§ 168.931(1)(b)(iv) and (1)(n).

Based on these provisions, there are two ways to apply for an AV ballot: (1) a written request signed by the voter, and (2) on an AV ballot application form provided for that purpose.  In both cases, the voter applies by returning a written request or form application to the voter's local clerk in person or by mail.  Mich. Comp. Laws §§ 168.759(1), (2), (6).  Clerks have also been instructed by the Secretary of State for a number of years to accept applications sent by facsimile and email.  Voters who cannot appear in person to deliver their application or cannot mail their application or return it by email or facsimile, may have an immediate family member deliver their application, or a voter may request another registered voter to return the application.  Mich. Comp. Laws §§ 168.759(4), (5), (6).  Thus, only persons authorized by law, i.e. those described in § 759(4), may return a signed application for an AV ballot to a local clerk.  Mich. Comp. Laws §§ 168.759(4)-(5).

What plaintiffs call the "Voter Transportation Ban" can be found at Mich. Comp. Laws § 168.931, and provides, in part:

> (1) A person who violates 1 or more of the following subdivisions is guilty of a misdemeanor:

> * * *

7

> (f) A person shall not hire a motor vehicle or other conveyance or cause the same to be done, for conveying voters, other than voters physically unable to walk, to an election.

Mich. Comp. Laws § 168.931(1)(f) (hereinafter "Voter Transportation Law"). Under this provision, a person cannot pay for the transportation of a voter to the polls unless the voter is physically unable to walk.  This language has existed in some form since 1895, *see* 1895 P.A. 35, and has been a part of Michigan's modern election law since it was reenacted in 1954 P.A. 116.  It was amended by 1982 P.A. 201 to replace the term "carriage" with the current term "motor vehicle."  Plaintiffs allege that they are "expending and diverting additional funds and resources" in get-out-the-vote (GOTV), voter education efforts, mobilization, and turn-out activities "at the expense of" other efforts in Michigan and in other states.  (ECF No. 17, PageID.98, ¶ 25).  Plaintiffs further allege that they are required to expend "additional resources" to educate their employees, volunteers, and partners about the statutes and how to comport their activities with the law.  *Id*.

Plaintiffs challenge the Voter Transportation Law (Mich. Comp. Laws § 168.931(1)(f)) (*see* ECF No. 17 PageID.101-107, ¶¶ 33-47) and what they call the "Absentee Ballot Organizing Ban" (hereinafter the "Absentee Ballot Law") (Mich. Comp. Laws § 168.759(4), (5), (8)) (*see* ECF No. 17, PageID107-112, ¶¶ 48-55).  More particularly, they contend that the Absentee Ballot Law is (1) unconstitutionally vague and overbroad under the First and Fourteenth

Amendments (Count I); (2) violative of their Speech and Association rights under the First and Fourteenth Amendments (Count II); (3) an undue burden on the fundamental right to vote under the Fourteenth Amendment (Count III); and (4) a violation of Section 208 of the Voting Rights Act of 1965 (Count IV).  Similarly, they assert that the Voter Transportation Law is (1) unconstitutionally vague and overbroad under the First and Fourteenth Amendments (Count V); (2) violative of their Speech and Association rights under the First and Fourteenth Amendments (Count VI); (3) an undue burden on the fundamental right to vote under the Fourteenth Amendment (Count VII); and (4) a violation of the Section 208 of the Voting Rights Act of 1965 (Count VIII).  (ECF No. 17).

## III.   ANALYSIS AND CONCLUSION

### A.   Standing

#### 1.   Standard of Review

As explained in *McQueary v. Colvin*, 2017 WL 63034, at *3 (W.D. Ky. Jan. 5, 2017), a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction "can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014) (citing *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994)).  "A facial attack is a challenge to the sufficiency of the pleading itself.  On such a motion, the court must take the material allegations of the petition

as true and construed in the light most favorable to the nonmoving party."
*McQueary*, at *3 (quoting *Ritchie*, 15 F.3d at 598); *see also Cartwright*, 751 F.3d at 759 ("A facial attack goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction, and the Court takes the allegations of the complaint as true for purposes of the Rule 12(b)(1) analysis").  "A factual attack, on the other hand, is not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction." *McQueary*, at *3 (quoting *Ritchie*, 15 F.3d at 598).  And, where a plaintiff relies on evidence outside the complaint to support a standing claim, the challenge is factual, and the Court instead must assess the factual basis for jurisdiction by weighing the evidence tendered.  *Forgy v. Stumbo*, 378 F. Supp. 2d 774, 776 (E.D. Ky. 2005) (citing *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004)); *see also Kardules v. City of Columbus*, 95 F.3d 1335, 1347 n. 4 (6th Cir. 1996) (The Sixth Circuit has recognized a district court's authority to consider extrinsic evidence when addressing the issue of standing.).  Defendant primarily makes a facial attack, with the exception of her voter representation challenges pertaining to Counts III and VII, which require the court to consider evidence outside of the amended complaint.

### 2.    Injury-in-fact

To establish standing, a plaintiff must show a concrete and particularized injury that is actual or imminent, a causal connection between the injury and the conduct complained of, and likelihood that a favorable decision will redress the injury. *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016) (citing *H.D.V.–Greektown, LLC v. City of Detroit*, 568 F.3d 609, 616 (6th Cir. 2009)).  In addition to suing on behalf of its members, an entity may sue "on its own behalf because it has suffered a palpable injury as a result of the defendants' actions." *Id*. (citing *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332–33 (6th Cir. 2002)).  At the motion to dismiss stage, the court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990).  When reviewing a motion to dismiss on the basis of standing, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Kardules v. City of Columbus*, 95 F.3d 1335, 1346 (6th Cir. 1996) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).  The plaintiff does, however, bear the burden of establishing standing and must "clearly allege facts demonstrating each element." *Parsons v. U.S. Dept. of Justice*, 801 F.3d 701, 710 (6th Cir. 2015) (quoting *Warth*, 422 U.S. at 518).

Plaintiffs allege they are injured by the laws because the statutes proscribe political expression in which they desire to engage. (ECF No. 17, PageID.97, ¶ 23). The statutes proscribe offering to assist voters with absentee ballot applications, restrict possession of absentee ballot applications, and ban paying a third party to transport voters to the polls. Plaintiffs want to do each of these things, and they assert that they have no choice but to abstain from engaging in that conduct because the statutes ban it. Accordingly, the challenged statutes harm plaintiffs even in the absence of prosecutions, they posit, because they are required to abstain from engaging in constitutionally protected political expression. (ECF No. 17, PageID.97-98, ¶ 23).

Plaintiffs also allege in the complaint that the challenged statutes frustrate the plaintiffs' mission of, and efforts in, educating, mobilizing, and turning out voters in Michigan by reducing the transportation options of Michigan citizens to get to polling places and by criminalizing the acts of individuals and organizations that want to (1) transport individuals to vote and (2) assist voters with registering for or returning absentee ballot applications. (ECF No. 17, PageID.98, ¶ 24). They also say that they are expending and diverting additional funds and resources in GOTV, voter education efforts, mobilization, and turn-out activities in Michigan, and for Priorities and Rise, this is happening at the expense of its efforts in other states, in order to combat the effects of the Voter Transportation Law and

Absentee Ballot Law.  (ECF No. 17, PageID.98-99, ¶ 25).  Plaintiffs say they are

required to expend additional resources and employee time to educate their

employees, volunteers, and partners about the Voter Transportation and Absentee

Ballot Laws to avoid exposing them to criminal prosecution.  *Id.*  Specifically, Rise

and DAPRI focus programming on getting students to the polls.  Because of the

Voter Transportation Law, volunteers and DAPRI will have to recruit and train

volunteers to drive students to vote rather than renting large capacity vehicles such

as buses or leveraging existing resources like the Detroit Bus Company and Uber.

(ECF No. 17, PageID.99, ¶ 26).  Plaintiffs also allege an injury caused by both

laws because they abstained from political expression proscribed by these statutory

restrictions out of a credible fear of prosecution.  Plaintiffs allege that defendant

and other state officials have refused to disavow enforcement of the Voter

Transportation Law and the Absentee Ballot Law.  (ECF No. 17, PageID.99, ¶ 27;

*see also*, ¶¶ 28, 30, 31, 32).

Defendant asserts three purported defects in the amended complaint such

that plaintiffs have failed to establish standing: (1) insufficient facts to support a

"credible threat of prosecution"; (2) insufficient facts to support their claim that

they will have to "divert resources" to comply with the statutes; and (3) plaintiffs

fail to allege that they have any members who are Michigan voters and they do not

sufficiently allege how they as institutions have been injured by the challenged statutes.

### a.   Threat of Prosecution

Defendant's standing argument as to the credible threat of prosecution does not address head-on plaintiffs' allegations that the statutes preclude them from engaging in constitutionally protected political expression.  The Supreme Court has made clear that the burden of establishing a credible threat of prosecution is fairly minimal in this specific context.  When an individual is subject to a threat of enforcement, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014) (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights"); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-129 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat")).  Rather, the Supreme Court has held that a plaintiff satisfies the injury-in-fact requirement where he alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."  *Id*. (quoting *Babbitt*

*v. Farm Workers*, 442 U.S. 289, 298 (1979)).  In the motion to dismiss context, a plaintiff "must plead—and in later stages of litigation, prove"—"an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1049 (6th Cir. 2015) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Defendant overlooks the appropriate standard for "credible threat of prosecution" where a statute implicates the First Amendment.  "Within the context of the First Amendment, the Supreme Court has enunciated concerns that justify a lessening of the usual prudential requirements for a pre-enforcement challenge to a statute with criminal penalties." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 284-85 (6th Cir. 1997) (citing *Sec'y of State of Maryland v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984)).  The harm alleged in First Amendment cases is the "chilling effect" on the constitutionally protected right to free expression, which, the Supreme Court has stated, is "of transcendent value to all society." *Id*. (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965)).  Indeed, a statute prohibiting activity protected by the First Amendment leads to "self-censorship, a harm that can be realized even without an actual prosecution." *Id*. (quoting *Virginia v. American Booksellers Ass'n, Inc*., 484 U.S. 383, 393 (1988); *Dombrowski*, 380 U.S. at 486-87 (the practical value of the First Amendment right may be destroyed

if not vindicated before trial)).  Thus, the appropriate inquiry in pre-enforcement challenges in First Amendment cases "usually focuses on how imminent the threat of prosecution is and whether the plaintiff has sufficiently alleged an intention to refuse to comply with the statute in order to ensure that the fear of prosecution is genuine and the alleged chill on First Amendment rights is concrete and credible, and not merely imaginative or speculative."  *Id*. (citing *Steffel v. Thompson*, 415 U.S. at 459; *Babbitt*, 442 U.S. at 301-03).  The Sixth Circuit has explained that parties not yet affected by the actual enforcement of the statute are allowed to challenge actions under the First Amendment in order to ensure that an overbroad statute does not act to "'chill' the exercise of free speech and expression," a constitutionally protected right.  *Id*. (quoting *Dambrot v. Central Michigan Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995)).

Here, plaintiffs have plainly alleged their intention to violate the statutes and alleged that defendant, and all county prosecutors in the State of Michigan have refused to disavow enforcement:

> 28.   On October 8, 2019, Plaintiff Priorities USA through counsel sent a letter to Secretary of State Jocelyn Benson with Defendant copied on the correspondence laying out Priorities USA's concerns about the Voter Transportation Ban and the Absentee Ballot Organizing Ban. The letter requested an official opinion by Defendant regarding the constitutionality of the statute and generally requested a response by October 21, 2019. Neither Secretary Benson nor Defendant responded to the letter.

30.     On January 11, 2020, Plaintiff Priorities USA  through counsel sent a letter to Defendant stating that it is both "contemplating spending money to transport Michigan voters to the polls ... by, among other things, funding local efforts to hire vehicles to transport voters to the polls" and "contemplating deploying staff and volunteers to (1) educate Michigan voters about their options to use and request absent voter ballot applications; (2) distribute absent voter ballot applications; (3) offer to return absent voter ballot applications; and (4) actually return absent voter ballot applications."  Priorities USA expressed concern that these activities would violate the criminal statutes at issue in this litigation.  Priorities USA requested that Defendant "commit to not prosecuting Priorities  USA, its agents, and others who engage in such activities." Priorities USA requested a response "to be received no later than January 23, 2020."  Again, Defendant did not respond.

* * *

31.     On January 10, 2020 via email and on January 13, 2020 via U.S. first class mail, Plaintiff Priorities USA sent letters to all 83 county  prosecutors in the State of Michigan with a duty to enforce the Absentee Ballot Organizing Ban and the Voter Transportation  Ban.  Mich. Comp. Laws § 169.940. Those letters were substantively identical to the one sent to Defendant, requested an assurance that the prosecutors would not enforce the statutes at issue in this litigation against Plaintiffs if they engaged in activity proscribed by the statute.  The letters requested a response by January 23, 2020.  Five prosecutors responded but refused to commit to not prosecute. The other seventy-eight prosecutors declined to respond.

32.     As of the filing of this Amended Complaint, Defendant and the eighty-three county prosecutors responsible for enforcement of the Absentee Ballot

> Organizing Ban and the Voter Transportation Ban
> continue to refuse to disavow prosecution of Plaintiff
> Priorities USA and others wishing to engage in activity
> covered by the challenged statutes.

(ECF No. 17, PageID.100-101).  Plaintiffs expressly laid out their plans and how their plans violated the statutes at issue.  Plaintiffs' plan involves the expression of core political speech and defendant did not disavow enforcement.  *See League of Women Voters v. Hargett*, 400 F.Supp.3d 706 (M.D. Tenn. 2019) ("[E]ncouraging others to register to vote" is "pure speech," and, because that speech is political in nature, it is a "core First Amendment activity.") (quoting *League of Women Voters of Fla. v. Browning*, 863 F.Supp.2d 1155, 1158 (N.D. Fla. 2012)).  It is evident from the amended complaint that plaintiffs are self-censoring based on defendant's refusal to disavow enforcement.  Accordingly, plaintiffs have sufficiently alleged a credible threat of prosecution necessary to support their First Amendment claims.

### b.    Diversion of resources

Contrary to defendant's suggestion that the Sixth Circuit rejected the diversion of resources theory of standing in *Fair Elections Ohio v. Husted*, the theory is alive and well in this Circuit.  As plaintiffs point out, a multitude of cases support this theory.  *See Mote v. City of Chelsea*, 284 F.Supp.3d 863, 887 (E.D. Mich. 2019) (organization had standing when it diverted resources to secure the defendant's Americans with Disabilities Act compliance, because "that diversion of resources ha[d] impacted its capacity to provide the range of other services that

it offers to disabled persons"); *Zynda v. Arwood*, 175 F.Supp.3d 791, 804 (E.D. Mich. 2016) (finding organizational standing due to diversion of resources); *Ne. Ohio Coal. for the Homeless ("NEOCH") v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016) (finding standing where the organization "overhauled" its election strategy and redirected its focus to in-person voting instead of absentee voting).  In *Fair Elections Ohio*, the Court found that, in the context of summary judgment, the plaintiff had failed to provide sufficient evidence of a diversion of resources. Plaintiffs here are not yet held to a summary judgment standard and their amended complaint contains a number of examples of how they are diverting resources in order to comply with the statutes at issue.  *See* ECF No. 17, ¶ 26 (Plaintiffs "will have to recruit and train volunteers to drive students to voting rather than renting large capacity vehicles such as buses or leveraging existing resources like the Detroit Bus Company…and Uber"); ¶ 25 (Plaintiffs "are expending and diverting additional funds and resources in GOTV, voter education efforts, mobilization, and turn out activities in Michigan, at the expense of [their] other efforts…in order to combat the effects of the Voter Transportation Ban and the Absentee Ballot Organizing Ban.  Plaintiffs are required to expend additional resources and employee time to educate their employees, volunteers, and partners about the Voter Transportation Ban and the Absentee Ballot Organizing Ban to avoid exposing them to criminal prosecution.").  Defendant says these allegations are insufficient,

pointing to the extensive facts put forth by the plaintiff in *Zynda*.  However, *Zynda*
involved a factual attack on subject matter jurisdiction and thus, the Court
considered evidence outside the pleadings.  Defendant has not made a factual
attack with respect to these claims.  Similarly, defendant also points to the factual
record in *Mote*, but that case involved a motion for summary judgment, which
places an entirely different burden on the non-moving party.  And notably,
contrary defendant's suggestion in the reply, there is no threshold of "significance"
of the injury to the organization that must be exceeded to render the harm
sufficiently concrete under Article III.  *Mote*, 284 F.Supp.3d at 888.  Rather, the
Supreme Court holds that even unquantifiable and intangible harms may qualify as
injuries in fact, and the impairment of the organizations' operations need only be
"perceptible" to suffice.  *Id*. (citing *Havens*, 455 U.S. at 379; *Spokeo, Inc. v.
Robins*, ⸺ U.S. ⸺, 136 S.Ct. 1540, 1549 (2016)).

Additionally, *Fair Elections Ohio* is distinguishable in several important
respects.  First, unlike the present case, the organizational plaintiff in *Fair
Elections* was only asserting the rights of third-parties.  Second, the trial court
found standing because the plaintiff had learned of the disenfranchisement of late
jailed voters (who, unlike those hospitalized just before an election, were not
afforded the ability to obtain an absentee ballot if jailed after 6:00 pm on the Friday
before Election Day) "late in the game."  Accordingly, the organization  was not

able to modify its voting rights placards or print new supplemental materials and had to use its small staff to teach election volunteers that a pre-election arrest could result in the loss of a chance to vote. *Id.* at 459. The Court of Appeals observed that the mere fact that the plaintiff organization's materials and training were inaccurate did not establish constitutional standing because even if relief were granted, the organization would still be required to train its employees correctly on the law and change its materials accordingly. Thus, any injury was not fairly traceable to the defendant's conduct. Here, most of plaintiffs' claims are not based on third-party standing and their allegations of diverted resources are not based on being "late to the game." Rather, they allege that they must recruit volunteers to perform activities (driving voters to the polls) when they could simply purchase such services, absent the Voter Transportation Law. Additionally, they allege that resources spent on combating the effects of the laws could be used for other GOTV activities. Accordingly, the court is not persuaded that *Fair Elections Ohio* compels it to conclude that plaintiffs here failed to sufficiently allege a diversion of resources theory of standing.

The court is also not persuaded by defendant's argument that *NEOCH* is inapplicable here because it involved a recently amended law. While that was a salient point in *NEOCH* in order to distinguish it from *Fair Elections Ohio*, the Court does not read *NEOCH* to suggest that an organization may only challenge

changes in the law.  Indeed, such a suggestion would foreclose untold litigation. *See Democratic Party of Ga., Inc. v. Crittenden*, 347 F.Supp.3d 1324, 1337 (N.D. Ga. 2018) ("It is immaterial whether the organizational injury resulted from a change in the law or a change in election-year conditions and circumstances that bring into focus potential problems with the state's statutory framework.").

And, as plaintiffs point out, the statutes at issue must be viewed in light of the changes in circumstances and technology.  The Voter Transportation  Law was passed long before hired vehicle transportation in the form of rideshare companies such as Uber and Lyft, and short-term rental companies like ZipCar became part of the modern transportation system.  Uber's rides-to-the-polls promotion, which benefited voters everywhere in the country except for Michigan in 2018, did not exist in 1982 when the law was amended.  (ECF No. Dkt. 17, ¶ 41).  And the Absentee Ballot Law predates Proposal 3, which dramatically increases the role of absentee ballot voting in Michigan's elections.  (ECF No. 17 ¶¶ 2, 17).  The Court thus concludes, under Rule 12(b)(6), that plaintiffs meet the injury-in-fact standard, based on a diversion of resources.

### 3.  Representative Capacity

Defendant next asserts that, to the extent plaintiffs are asserting the rights of unidentified non-parties, they cannot meet the Supreme Court's prudential standing requirements.  That is, plaintiffs are attempting to advance the legal rights of others

(voters and other organizations who are purportedly affected by the laws) and thus, they have alleged no particularized injury.

In response, plaintiffs point out that six of their eight causes of action rely on their own rights and injuries as organizations. The only claims that might be subject to a prudential standing analysis are the claims of undue burden on the fundamental right to vote (Counts III and VII) because plaintiffs assert the legal rights of third-parties – voters themselves. Plaintiffs contend that both DAPRI and Rise have prudential standing to assert these claims. More specifically, plaintiffs argue that DAPRI and Rise have prudential standing to assert the rights of Michigan voters because they enjoy (1) a close relationship between them and the voters who hold the rights; or (2) disallowing them to assert these claims would hinder voters' ability to protect their own interest. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Because this is a prudential standing doctrine, the Court has "been quite forgiving with these criteria in certain circumstances." *Id*. Plaintiffs aver that such circumstances are at play here, where "enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." *Id*.

The court disagrees with plaintiffs' analysis. The "forgiving circumstances" referenced in *Kowalski* are not present here. For example, the First Amendment rights of the non-party voters are not implicated as in *Secretary of State of Md. v.*

*Joseph H. Munson Co., Inc.*, 467 U.S. 947 (1984).  Nor have plaintiffs identified a "special relationship" between them and the as-yet unidentified voters like the doctor-patient relationship present in *Doe v. Bolton*, 410 U.S. 179 (1973).  Rather, the present circumstances are more like those reviewed in *Fair Elections Ohio v. Husted*, 770 F.3d 456 (6th Cir. 2016).  In *Fair Elections Ohio*, the plaintiffs were organizations and could not vote.  And just as in this case, the plaintiffs wanted to assert the right to vote of unidentifiable individuals.  The Court found neither a "close relationship" between the plaintiff organization and the unidentified voters nor a "hindrance" to the voters' ability to protect their own rights.  *Id*. at 461 (citing *Kowalski*, at 129-30).  More specifically, the Court concluded that the relationship between the plaintiff organization and the voters it sought to help did not resemble the close relationship of the lawyer-client or doctor-patient relationships recognized by the Supreme Court in *Kowalski*.  *Id*.  Plaintiffs' contention that they have developed relationships with categories of voters (e.g. "hourly wage workers," "senior voters," "low-income voters") based on their respective missions and outreach efforts in various communities is an unavailing distinction.  Plaintiffs have not pointed to any authority suggesting that the type of relationship they have described is sufficiently close to meet the standard.  The most that the court can discern from plaintiffs' description is that the plaintiffs have targeted their efforts toward unidentified future voters within the described

categories.  As to how the targeted voters have come to regard the plaintiffs is left unaddressed.  Since, as discussed above, the plaintiffs do not meet the standard for a special relationship, at minimum, a more fulsome picture of their relational dynamics with these future voters is necessary for the court to gauge the "closeness" of the relationship.  As it stands, the current picture does not line up with the precedential authority discussed.  Plaintiffs suggest that the doctrine of prudential standing has been called into doubt.  However, even if true, this court is bound to follow applicable precedent from superior courts.  The Supreme Court mandates that when "precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [inferior court] should follow the case which directly controls, leaving to th[e Supreme] Court the prerogative of overruling its own decisions."  *Zynda v. Arwood*, 175 F.Supp.3d 791, 812 (E.D. Mich. 2016) (quoting *Tenet v. Doe*, 544 U.S. 1, 10-11 (2005) (citing *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)).  Accordingly, the court adheres to applicable precedent regarding prudential standing.  *See EMW Women's Surgical Ctr., P.S.C. v. Meier*, 373 F.Supp.3d 807, 826 (W.D. Ky. 2019) (quoting *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1329 (11th Cir. 2018) (citing U.S. Const. art. III § 1) ("In our judicial system, there is only one Supreme Court, and we are not it.  As one of the 'inferior Courts,' we follow its decisions.'").

Furthermore, plaintiffs' argument addressing hindrance centers on the difficulties that the persons who their organizations target for outreach have in voting, rather than what, if any, obstacles they might face in asserting their legal rights to bring their claims.  (*See* ECF Nos. 22-5, 22-6).  That is, plaintiffs' argument, and the affidavits on which they rely, focus on the non-parties being hindered from voting, not on them being hindered in challenging the laws, which is part of the core holding in *Kowalski*.  *Id*.  An example of a "hindrance" can be found in *NAACP v. Alabama*, 357 U.S. 449 (1958), where the Supreme Court held that the NAACP, in resisting a court order that it reveal the names of its members, could assert the First and Fourteenth Amendments rights of its members to remain anonymous.  The Court reasoned that "(t)o require that (the right) be claimed by the members themselves would result in nullification of the right at the very moment of its assertion."  *Id*. at 459; *see also Singleton v. Wulff*, 428 U.S. 106, 116 (1976).  Plaintiffs here have not identified how persons affected by the contested laws are hindered from challenging those laws in the manner prescribed by *Kowalski* and its antecedents.  For these reasons, the court concludes that plaintiffs Rise and DAPRI do not have standing to assert the claims set forth in Counts III and VII of the amended complaint and those claims are dismissed.[1]

---

[1]  Plaintiffs do not claim that Priorities has standing to assert these claims and accordingly, this issue will not be addressed.

B.    Failure to State a Claim

1.    Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must first comply with Rule 8(a)(2), which requires "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A plaintiff is also obliged "to provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Association of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555 (citations and internal quotation marks omitted)).

In *Iqbal*, the Supreme Court explained that a civil complaint only survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  And, while a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be

enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id.* (quoting *Twombly*, 550 U.S. at 555 (citation and internal quotation marks omitted)); *see also League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (the factual allegations in a complaint need not be detailed but they "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief.").

2.    Absentee Ballot Law

The parties disagree on whether the *Anderson-Burdick* balancing test applies to the inquiry of whether plaintiffs' complaints about the Absentee Ballot Law state claims of constitutional proportions. The "flexible balancing approach" also known as the *Anderson- Burdick* framework, after *Burdick v. Takushi*, 504 U.S. 428 (1992) and *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1982), "can sometimes make it hard to fit First Amendment challenges to election laws into ordinary constitutional categories." *League of Women Voters v. Hargett*, 400 F.Supp.3d 706, 721 (M.D. Tenn. 2019) (citing *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016)). When a state's law "'severely' burdens the fundamental right to vote, as with poll taxes, strict scrutiny is the appropriate standard." *Hargett*, 400 F.Supp.3d at 721 (citing *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012) (quoting *Burdick*, 504 U.S. at 434)). But, in cases with no actual

28

burden on a right to vote or other constitutional right, "a straightforward rational basis standard of review should be used." *Id.* (citing *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807-09 (1969); *Biener v. Calio*, 361 F.3d 206, 214-15 (3d Cir. 2004)). As acknowledged in *Hargett*, "[t]he distinction between 'severe burdens' and 'lesser' ones," however, "is often murky," *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 443 (6th Cir. 2016) (citation omitted), and "most cases fall in between these two extremes." *Obama for Am.*, 697 F.3d at 429.

As explained in *Hargett*, the rationale for *Anderson- Burdick* assumes that "'election cases rest at the intersection of two competing interests,' namely, an individual's right to vote versus a state's prerogative to regulate the right to vote." *Id.* (quoting *Mich. State A. Philip Randolph Inst. v. Johnson*, 749 Fed. Appx. 342, 349 (6th Cir. 2018) (quoting *Ohio Democratic Party*, 834 F.3d at 626)). Yet, some election-related laws implicate more than those two sets of concerns. *Id.* Specifically, laws that govern election-related speech and association, go beyond the mere intersection between voting rights and election administration, and turn toward the area where "the First Amendment 'has its fullest and most urgent application.'" *Id.* (quoting *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)). In this area, the Supreme Court applies "exacting scrutiny" rather than *Anderson- Burdick* when a case involves election-related speech as opposed to "the

mechanics of the electoral process." *Id*. (quoting *McIntyre*, 514 U.S. at 345, 347 (reviewing law banning the circulation of anonymous literature intended to affect an election).

The *Hargett* court compared the law at issue before it to those evaluated by the Supreme Court in *Meyer v. Grant*, 486 U.S. 414 (1988) and *Buckley v. American Constitutional Law Foundation, Inc*., 525 U.S. 182 (1999). The statute at issue in *Hargett* was challenged as unconstitutionally vague under the Fourteenth Amendment and violative of the First Amendment. The challenge targeted key provisions of a statute governing voter registration drives and related activities. In *Buckley*, the Supreme Court struck down three Colorado restrictions on petition circulators: "(1) the requirement that initiative-petition circulators be registered voters; (2) the requirement that they wear an identification badge bearing the circulator's name; and (3) the requirement that proponents of an initiative report the names and addresses of all paid circulators and the amount paid to each circulator." 525 U.S. at 186, 205, 119 S.Ct. 636 (citations omitted). *Hargett* also recognized that the Supreme Court explicitly rejected the argument that the logistical aspects of collecting signatures could be easily separated from the regulation of speech because "[t]he circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Id*. at 723 (quoting *Meyer*, 486

U.S. at 421).  The Supreme Court concluded that the regulation of the petition-drive activities at issue "involve[d] a limitation on political expression subject to exacting scrutiny."  *Meyer*, 486 U.S. at 420 (citing *Buckley v. Valeo*, 424 U.S. 1, 45 (1976)).  "[T]he First Amendment," the Court explained in *Buckley*, "requires us to be vigilant" when such activities are regulated, "to guard against undue hindrances to political conversations and the exchange of ideas."  525 U.S. at 192 (citing *Meyer*, 486 U.S. at 421).  As a result, the Court held that the prohibitions were unconstitutional because they "significantly inhibit[ed] communication with voters about proposed political change, and [were] not warranted by the state interests (administrative efficiency, fraud detection, informing voters) alleged to justify those restrictions."  The Court emphasized the laws' tendency to result in "speech diminution" by "decreas[ing] the pool of potential circulators" of petitions. *Id*. at 194; *see also  Bailey v. Callaghan*, 715 F.3d 956, 969 (6th Cir. 2013) (referencing *Meyer* as an example of the rule that the First Amendment applies "not only to laws that directly burden speech, but also to those that diminish the amount of speech by making it more difficult or expensive to speak") (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 337 (2010); *Meyer*, 486 U.S. at 424)).

Importantly, the Sixth Circuit has recognized that the principles elucidated in *Meyer* and *Buckley* are not limited to the circulation of initiative petitions.  *See*

*Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 316 (6th Cir. 1998)

(applying *Meyer- Buckley* framework to law governing solicitation of political

contributions).  The *Hargett* court concluded that a "person's decision to sign up to

vote is more central to shared political life than his decision to sign an initiative

petition."  *Id.* at 724.  Moreover, a discussion of whether to register to vote plainly

"implicates political thoughts and expression."  *Id*. (quoting *Buckley*, 525 U.S. at

195).

     *Hargett's* rationale is persuasive.  Unlike cases involving the mere

administrative process or the mechanics of the electoral process, here, the Absentee

Ballot Law, as interpreted by plaintiffs and as set forth in the amended complaint,

involves the regulation of political speech.  The court sees little difference between

discussions of whether to register to vote and discussions of whether to vote

absentee.  As set forth above, plaintiffs want to deploy staff and volunteers to (1)

educate Michigan voters about their options to use and request absent voter ballot

applications; (2) distribute absent voter ballot applications; (3) offer to return

absent voter ballot applications; and (4) return absent voter ballot applications.

Such actions necessarily involve political communication and association, and

thus, just as in *Hargett*, the exacting scrutiny standard found in *Meyer* and *Buckley*

is applicable here.

a.    Vagueness

According to plaintiffs, it is not clear from the face of the statute whether soliciting includes passive conduct that induces a voter to entrust her absentee ballot application to a third party or offers of assistance that do not explicitly involve a request.  Several statutory provisions are implicated by plaintiffs' claim.  First, § 759(4) provides that a person must not possess an absentee voter ballot application unless they are a "registered elector requested by the applicant to return the application."  Subsection § 759(5) requires the registered elector to certify that he or she is delivering the absentee voter ballot application at the request of the applicant that he or she "did not solicit or request to return the application" and that he or she did not "influence[] the application."  Subsection § 759(8) provides that "[a] person who is not authorized in this act and who both distributes absent voter ballot applications to absent voters and returns absent voter ballot applications to a clerk or assistant of the clerk is guilty of a misdemeanor."  Defendant maintains that the conduct being prohibited is plain and clear.  One must not "solicit or request" to return an absentee ballot application.  Defendant asserts that the words "solicit" and "request" are not ambiguous or vague and are readily understood in their ordinary and common meaning.  Simply put, according to defendant, the statute prohibits a person from asking to return an absentee ballot application.

"[B]asic principles of due process set an outer limit for how vague a statutory command can be if a person is going to be expected to comply with that command." *Hargett*, at 727 (citing *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 894 F.3d 235, 251 (6th Cir. 2018)). Specifically, a statute is unconstitutionally vague under the Fourteenth Amendment if its terms "(1) 'fail to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or (2) 'authorize or even encourage arbitrary and discriminatory enforcement.'" *Id*. at 246 (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).  "'[A] more stringent vagueness test should apply' to laws abridging the freedom of speech ...." *Id*. (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 499 (1982)).  That standard can be "relaxed somewhat" if the law at issue "imposes civil rather than criminal penalties and includes an implicit scienter requirement." *Id*. (citing *Hoffman Estates*, 455 U.S. at 499).

Defendant contends that plaintiffs could make a factual recitation of a voters' right to request assistance in conjunction with delivering an application and thus, the statute is not vague.  Yet, does so strictly limiting plaintiffs' ability to speak about the absentee ballot application process cure any vagueness challenge? Essentially, defendant's interpretation bars all explanation or communication except a rote recitation of the statute's language.  This interpretation exemplifies

why the term "solicitation" in this context might be unconstitutionally vague.  The

term may be perfectly understood in some contexts, *see e.g.*, *Platt v. Bd. of*

*Commissioners on Grievances & Discipline of Ohio Supreme Court*, 894 F.3d 235,

261 (6th Cir. 2018), but deemed vague in other contexts.  Here, the statute does not

explain what is meant by the ban on solicitation and accordingly "does not

sufficiently specify what those within its reach must do in order to comply."

*Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 621 (1976).  As

plaintiffs explain in their brief:

> Presumably an individual solicits or requests to assist a
> voter when he says, "May I return your absentee ballot
> application for you?" But what about if an individual tells
> a voter "I would be happy to return your absentee ballot
> application for you" or "I am returning your neighbor's
> absentee ballot application" or "I am forbidden from
> 'soliciting' or 'requesting' to return your absentee ballot
> application, so I can't ask you, but if you ask me then
> I would be happy to assist"? Although none can be
> banned under the First Amendment, … it is not clear
> which, if any, the challenged provision permits.

(ECF No 40, PageID.770).  The court concludes that plaintiffs have plausibly

alleged that even if the law covers only a narrow range of conduct as described by

defendant (only formal, direct requests to assist), the apparent inexactness of the

statutory ban on solicitation may capture a broader range of speech and

association.  Accordingly, at this stage of the proceedings, plaintiffs have

sufficiently stated a claim for unconstitutionally vagueness.

Defendant also contends that even if the statute could be applied to more conduct or speech, this court could provide a limiting construction of the statute to include only the conduct encompassed within a common understanding of the statute's words.[2]  It does not appear, however, that such a proffered limiting construction is generally addressed in the context of a motion to dismiss.  The cases on which defendant relies were postured in other procedural contexts, including summary judgment, after an evidentiary hearing, and an appeal from a post-trial conviction.  *See Green Party of Tenn. v. Hargett*, 700 F.3d 816 (6th Cir. 2012) (summary judgment); *Grayned v. City of Rockford*, 408 U.S. 104 (1972) (appeal from post-trial conviction); *Broadrick v. State of Okl. ex rel. Oklahoma State Pers. Bd.*, 338 F. Supp. 711, 714 (W.D. Okla. 1972), aff'd sub nom. *Broadrick v. Oklahoma*, 413 U.S. 601 (1973) (affirmed by Supreme Court after evidentiary hearing below).  Other cases address a limiting construction in the

---

[2] Defendant's argument may be inartfully worded, but in circumstances such as those presented in this case, such a limiting construction is not typically provided by the court.  As explained in *Belew v. Giles Co. Adult-Oriented Establishment Board*, 2005 WL 6369661 (M.D. Tenn. Sept. 30, 2005), due to concerns of federalism that arise when a federal court reviews the constitutionality of a state regulation that is challenged as unconstitutionally vague or overbroad, the reviewing court may not supply a limiting construction in order to save the regulation from being unconstitutional.  *Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 136 (6th Cir. 1994) (citing *Eubanks v. Wilkinson*, 937 F.2d 1118, 1122 (6th Cir. 1991) for the proposition that "federal 'courts do not rewrite statutes to create constitutionality.'").  Rather, such a limiting construction must come from a state court or enforcement agency.  *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)) (In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered.).

context of hearings/trials on preliminary or permanent injunctions. *See e.g.*,

*Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489 (1982)

(Preliminary injunction hearing/trial held below); *Triplett Grille, Inc. v. City of*

*Akron*, 40 F.3d 129, 136 (6th Cir. 1994) (Motion for permanent injunction).

Accordingly, in the court's view, this issue is best left addressed in the context of

the parties' pending motion for preliminary injunction.

> b.     Burden on Speech and Association

Defendant maintains that essentially, the Absentee Ballot Law only

implicates conduct and its burden on speech is minimal.  However, as set forth

above in detail, it is difficult to distinguish the political speech at issue here from

that in *Hargett*, *Meyer*, and *Buckley*.  Accordingly, the court rejects defendant's

"conduct only" argument.  Defendant also argues that any burden caused by the

law is minimal and is outweighed by the State's interest "in preserving the integrity

of the ballot application process."  (ECF No. 27, PageID.418).  To withstand

exacting scrutiny, the Absentee Ballot Law must have a substantial relationship

with a "sufficiently important" governmental interest.  *Citizens United*, 558 U.S. at

340; *John Doe #1 v. Reed*, 561 U.S. 186, 196 (2010) ("[T]he strength of the

governmental interest must reflect the seriousness of the actual burden on First

Amendment rights.").  Defendant argues that the Absentee Ballot Law preserves

the integrity of absentee voting by increasing the likelihood that a voter will entrust

her application with someone who is trustworthy and accountable.  According to plaintiffs, this argument requires the court to resolve a factual dispute—that is, whether a registered voter is more or less trustworthy than  an unregistered voter—which is beyond the scope of a 12(b)(6) motion.  *Sims v. Mercy Hosp. of Monroe*, 451 F.2d 171, 173 (6th Cir. 1971).  And, plaintiffs point out that whether a voter requests assistance from a stranger or is solicited by a stranger to provide assistance, a voter still decides to entrust a stranger with delivering an application, which undermines' defendant's position.

Plaintiffs maintain that the Absentee Ballot Law is insufficiently tailored to address the State's interest in preventing voter fraud as it targets the application process, not the casting of ballots.  Plaintiffs also point out that Michigan has robust laws protecting absentee voting and also "retains an arsenal of safeguards" to prevent voting fraud.  *Buckley*, 525 U.S. at 204.  There are seven Michigan criminal laws that address voting fraud, including laws that specifically target absentee voting fraud, which plaintiffs argue dramatically diminishes the need for the Absentee Ballot Law.  *See Buckley*,  525 U.S. at 204–05 (relying on alternatives also in place to prevent fraud including criminal penalties in striking down a restriction on political expression); *Meyer*, 486 U.S. at 427 (same).

Plaintiffs also argue that the registration  requirement is not fairly designed to serve any important government interest, as the *Buckley* decision recognized in

similar circumstances when it struck down a Colorado law allowing only registered voters to circulate initiative petitions because it was likely to result in "speech diminution." *Id*. at 193-94.  There, the record reflected that there were 400,000 voting eligible persons who were not registered to vote. *Id*. at 193.  The Supreme Court therefore concluded that "[b]eyond question, Colorado's registration requirement drastically reduces the number of persons, both volunteer and paid, available to circulate petitions." *Id*. at 183.  Here, plaintiffs allege that there are at least 750,000 persons who are eligible to vote but are not registered to vote residing in Michigan.  (ECF No. 17 ¶ 70).  And there are millions of U.S. citizens who do not reside in Michigan, some of whom would participate in plaintiffs' efforts to encourage and assist voters to vote absentee but for the registration requirement.  Plaintiffs maintain that the registration requirement should suffer the same fate as the registration requirement in *Buckley*.  Whether or not plaintiffs ultimately prevail on this basis, considering the cases discussed above, plaintiffs have stated a claim under the First Amendment.

The Absentee Ballot Law also proscribes non-family or household members from soliciting or requesting to help a voter to return an absentee ballot application.  Mich. Comp. Laws § 168.759(4), (5).  Plaintiffs maintain that this ban is subject to strict scrutiny because it operates differently based on the identity of the speaker, *see Citizens United*, 558 U.S. at 340-41, and because it is a content-

based restriction on speech. *Burson v. Freeman*, 504 U.S. 191, 197 (1992) (ban on an entire subject is content-based and subject to strict scrutiny). Regardless of which level of scrutiny applies, defendant does not explain how the requirement for delivery by a "registered elector" helps to ensure that the voter's application is properly delivered and that the voter identified on the application does want to obtain and vote by absentee ballot. Accordingly, plaintiffs have stated claim under the First Amendment.

c.      Preemption

Plaintiffs' amended complaint alleges that § 208 of the Voting Rights Act preempts the Absentee Ballot Law because it prohibits voters with limited English proficiency or some disability from receiving assistance from persons of their choice. (ECF No. 17, ¶¶ 71-77 (Count  IV)). According to the amended complaint, the Absentee Ballot Law (1) completely bars certain individuals from providing voters with assistance and (2) categorically prohibits persons who would otherwise be eligible from providing assistance to a voter if they asked to provide help to do so. (ECF No. 17 ¶¶ 75–76). Defendant maintains that no conflict exists.

Section 208 provides:

> Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.

40

52 U.S.C. § 10508.  The VRA defines the terms "vote" and "voting" to include:

> [A]ll action necessary to make a vote effective in any
> primary, special, or general election, including, but not
> limited to, registration, listing pursuant to this chapter, or
> other action required by law prerequisite to voting,
> casting a ballot, and having such ballot counted properly
> and included in the appropriate totals of votes cast with
> respect to candidates for public or party office and
> propositions for which votes are received in an election.

52 U.S.C. § 10310.

Conflict preemption occurs where compliance with both a federal and state regulation is physically impossible, or "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade v. Nat'l Solid Wastes Mgmt Ass'n*, 505 U.S. 88, 98 (1992).  According to defendant, § 208 plainly contemplates that it is the voter who is seeking the assistance.  And, § 759 also contemplates that it is the voter who will request someone else to return their AV ballot application.  Accordingly, defendant argues that the prohibition against a person actively soliciting to return a voter's application without a preceding request by the voter to do so does not conflict with the voter's rights under § 208 to affirmatively seek assistance.

Plaintiffs allege that it is impossible for the two laws to coexist.  Section 208 expressly provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability,  or  inability to read or write may be given assistance by a person of the voter's choice."  52 U.S.C. § 10508.  But the Absentee Ballot Law

restricts who a voter may choose to assist them in voting. Defendant's argument misses the primary point -- § 759 does not permit a voter to request just anyone to assist them. Rather, unless the person is a member of the voter's household or family, or an elector registered in Michigan, a voter cannot seek his or her assistance. Section 208, on the other hand, provides that a voter may be given assistance by anyone of that voter's choice. *See e.g.*, *Project Vote v. Blackwell*, 455 F.Supp.2d 694, 703 (N.D. Ohio 2006) (The pre-registration, training, and affirmation requirements imposed by Ohio law for only a selected class of persons (those who are compensated for registering voters) conflicted with the National Voting Registration Act's requirement that State programs to protect election integrity must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965."). Given this apparent conflict, which defendant does not propose to resolve, at a minimum, plaintiffs have stated a claim for preemption.

### 3.    Voter Transportation Law

Plaintiffs argue the same standard applies to the court's review of the Voter Transportation Law as the Absentee Ballot Law. They argue that the Voter Transportation Law regulates political expression protected by the First Amendment because it regulates political spending; that is, the Transportation Law imposes an unconstitutional $0 spending limit on transporting voters to the polls. (ECF No. 17 ¶ 44). Plaintiffs maintain that the act of transporting voters to the

polls is a recognized element of voter registration and get-out-the-vote drives. *See e.g.*, 11 C.F.R. § 114.4(d)(1) ("Voter registration and get-out-the-vote drives include providing transportation to the polls or to the place of registration."). They also point to *Emily's List v. Fed. Election Comm'n*, which observed that people "are entitled to spend and raise unlimited money for" "advertisements, get-out-the-vote efforts, and voter registration drives." 581 F.3d 1, 16 (D.C. Cir. 2009). Because it is an element of get-out-the-vote efforts, plaintiffs allege that the act of spending money to transport voters to the polls is political speech protected by the First Amendment. *See id*.; *see also Buckley v. Valeo*, 424 U.S. 1, 23 (1976) (noting that "expenditure ceilings impose . . . severe restrictions on protected freedoms of political expression and association"). Additionally, the Transportation Law regulates rides-to-the-polls efforts, which are a common organizing activity for political organizations who seek to encourage political activity. (ECF No. 17 ¶ 35). Accordingly, plaintiffs maintain that the conduct regulated by the Voter Transportation Law is protected political expression under the same body of case law that applies to the Absentee Ballot Law discussed above. The court agrees and the same exacting scrutiny standard is applicable.

a. Vagueness

The Voter Transportation Law provides as follows:

> (f) A person shall not hire a motor vehicle or other conveyance or cause the same to be done, for conveying

43

> voters, other than voters physically unable to walk, to an
> election.

Mich. Comp. Laws § 168.931(1)(f).  A person who violates this provision is guilty

of a misdemeanor.  Mich. Comp. Laws § 168.931(1).  Defendant acknowledges

that the statute does not define the term "hire" but points to a Michigan Court of

Appeals decision interpreting the term in another context to mean "'to engage the

services of for wages or other payment,' or 'to engage the temporary use of at a set

price.'"  *Tech & Crystal, Inc v. Volkswagen of Am, Inc*., 2008 WL 2357643, at *3

(Mich. App. June 10, 2008) (quoting Random House Webster's College Dictionary

(1997)).  According to defendant, the statute means that a person cannot engage the

service of a vehicle for a fee to transport a voter to an election unless the voter is

physically unable to walk to the election.  But the statute does not otherwise

prohibit a person from paying for expenses incurred in transporting a voter by

vehicle so long as it does not amount to hiring for the service.  Defendant

maintains that this interpretation renders the statute understandable by a person of

ordinary intelligence according to the common meaning of its words and thus, it is

not vague.

Plaintiffs maintain that defendant does not define what it means to "hire" a

vehicle; instead she only lists activities that the Transportation Law does not

prohibit: ECF No. 27 at 45 (paying for expenses); ECF No. 27 at 49 (paying for

gas); ECF No. 27 at 41 (using company or personal vehicles driven by employees

44

or volunteers); ECF No. 27 at 49 (providing free rides to the polls).  Plaintiffs

contend that these pronouncements make it no more clear to plaintiffs, other

citizens, and law enforcement, what is allowed and not allowed.

As explained above, "basic principles of due process set an outer limit for

how vague a statutory command can be if a person is going to be expected to

comply with that command." *Hargett*, at 727 (citing *Platt v. Bd. of Comm'rs on*

*Grievances & Discipline of Ohio Supreme Court*, 894 F.3d 235, 251 (6th Cir.

2018)).  Specifically, a statute is unconstitutionally vague under the Fourteenth

Amendment if its terms "(1) 'fail to provide people of ordinary intelligence a

reasonable opportunity to understand what conduct it prohibits' or (2) 'authorize or

even encourage arbitrary and discriminatory enforcement.'" *Id.* at 246 (quoting

*Hill v. Colorado*, 530 U.S. 703, 732 (2000)).  "'[A] more stringent vagueness test

should apply' to laws abridging the freedom of speech ...." *Id.* (quoting *Vill. of*

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)).

That standard can be "relaxed somewhat" if the law at issue "imposes civil rather

than criminal penalties and includes an implicit scienter requirement." *Id.* (citing

*Hoffman Estates*, 455 U.S. at 499).

Defendant's very argument illustrates why plaintiffs have plausibly set forth

facts demonstrating the Transportation Law may be unduly vague.  It is simply not

clear whether plaintiffs can contract with Uber to transport a voter and claim that it

is merely paying for "expenses" associated with transportation or whether an employee can provide rides to the polls while earning a salary or being paid hourly. Accordingly, the court concludes that plaintiffs have stated a claim that the Transportation Law is unconstitutionally vague.

The court must briefly address an issue defendant raised in the reply brief. In the reply, defendant articulates, for the first time, her proposed limiting construction that the Transportation Law only captures *quid pro quo* activities; that is, it only bans paying for rides to the polls where that expenditure is made in exchange for a vote on an issue or for a candidate. The court will not, however, address an issue raised for the first time in the reply. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration. Further the non-moving party ordinarily has no right to respond to the reply brief, at least not until oral argument. As a matter of litigation fairness and procedure, then, we must treat [such issues] as waived."). Moreover, as explained above, it does not appear that such a proffered limiting construction is generally addressed in the context of a motion to dismiss. Thus, as concluded above with regard to the limiting construction offered

for the Absentee Ballot Law, this issue is best left addressed in the context of the parties' pending motion for preliminary injunction.

        b.      Burden on Speech and Association

Defendant maintains that driving a voter to an election is not speech. The Court disagrees. As set forth above, the Transportation Law regulates political expression/spending. Defendant also contends that any burden is minimal and is outweighed by the State's interest in protecting voters from undue influence, helping to preserve the integrity of Michigan's elections. Defendant points to the number of ways a voter can receive free transportation to the polls and asserts that plaintiffs can cover driver expenses. According to defendant these minimal burdens are far outweighed by the State's interest in protecting voters from undue influence from any perceived "*quid pro quo*" arrangements when drivers are paid to take voters to the polls.

Plaintiffs maintain that the Transportation Law is not, as required, "closely drawn to serve a cognizable anti-corruption interest." *Emily's List*, 581 F.3d at 18 (citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 735 (2008); *Valeo*, 424 U.S. at 26–27). For example, under defendant's interpretation of the law, a private bus company could provide free rides to the polls, but plaintiffs could not hire that same bus company to provide free rides to the polls. Plaintiffs point out that the Supreme Court has rejected the notion paid petition circulators are more likely to

engage in corrupt behavior than a volunteer circulator (*Meyer*, 486 U.S. at 426). Accordingly, it is of questionable reasoning to suggest that paying drivers to transport voters to the polls contributes to corruption more than using employee or volunteer drivers.

Additionally, under exacting scrutiny, the State must show that the Voter Transportation Law bears a substantial relationship to a sufficiently important governmental interest. In the court's view, plaintiffs have stated a claim that the Voter Transportation Law is not substantially related to preventing *quid pro quo* corruption, or to preventing the exercise of "undue influence" on voters. The Voter Transportation Law does not, apparently, prohibit providing free transportation to voters, which would also confer a benefit of value on voters. Defendant also suggests that the law does not prohibit paying for transportation expenses. Yet, the law bans any hired transportation to the polls even if the ride is unrelated to support for a particular candidate or issue. And, as plaintiffs correctly point out, the State's interest in preventing *quid pro quo* arrangements is addressed in other laws on the books. *See Buckley*, 525 U.S. at 204-05 (relying on alternatives also in place to prevent fraud including criminal penalties in striking down a restriction on political expression). Indeed, Michigan Law makes it a crime to actually enter into a *quid pro quo* arrangement with a voter, Mich. Comp.

Laws § 168.932(a), or to promise or receive something of value for deciding for whom to vote, *id*. § 168.931(1)(a), (b).

Importantly, plaintiffs' amended complaint alleges that the Transportation Law poses a significant burden on rides-to-the-polls efforts. The diminution of such opportunities is unconstitutional. *See Meyer*, 486 U.S. at 416; *Buckley*, 525 U.S. at 193. In *Meyer* and *Buckley*, the Supreme Court reasoned that the challenged laws would diminish political expression by shrinking the pool of people available to assist the proponents of initiative petitions. *Buckley*, 525 U.S. at 194; *Meyer*, 486 U.S. at 423. Similarly, plaintiffs plausibly allege that because Michigan law limits the options available to ride organizers, the number of voters that organizers can transport is necessarily diminished as is their opportunities for political engagement and interaction. (ECF No. 17 ¶¶ 24, 38, 92). Accordingly, plaintiffs have stated a claim that the Voter Transportation Law is an impermissible burden on expressive activity.

c.     Preemption

Defendant maintains that the Transportation Law is not expressly preempted by federal law, specifically 11 C.F.R. § 114.4, which provides:

> Voter registration and get-out-the-vote drives permitted. A corporation or labor organization may support or conduct voter registration and get-out-the-vote drives that are aimed at employees outside its restricted class and the general public. Voter registration and get-out-the-vote

>drives include providing transportation to the polls or to
>the place of registration.

Defendant argues that the federal provision permits plaintiffs to provide transportation to the polls, as does the state statute.  Defendant asserts that plaintiffs can utilize its employees or volunteers to provide such rides.  They are only barred from "hiring" or paying a person or entity to transport voters to the polls, unless the voters are physically unable to walk to the polls.  Defendant maintains that the federal statute does not guarantee plaintiffs the right to "hire" or pay a person or entity to transport voters, only the opportunity to "provide" transportation.

Plaintiffs' argument is more focused than as characterized by defendant. Here, plaintiffs argue that the Federal Election Campaign Act (FECA) expressly preempts the Transportation Law.  "Express preemption exists where either a federal statute  or regulation contains explicit language indicating that a specific type of state law is preempted." *State Farm Bank v. Reardon*, 539 F.3d 336, 341-42 (6th Cir. 2008). FECA, which provides a uniform national regulation of political spending in federal elections, contains an express preemption provision that states, in relevant part, that "the provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to Federal office."  52 U.S.C. § 30143.  The scope of preemption was

further defined by the Federal Elections Commission in 11 C.F.R. § 108.7. Section

108.7 incorporates FECA's preemption statute and provides:

> (b) Federal law supersedes State law concerning the—
> * * *
> (3) Limitation on contributions and expenditures
> regarding Federal candidates and political committees.

Plaintiff's amended complaint alleges that the Voter Transportation Law functions

as a limitation on expenditures by criminalizing disbursements for providing

transportation to the polls for all elections including federal elections. *Weber v.*

*Heaney*, 793 F.Supp.1438, 1452 (D. Minn. 1992), aff'd, 995 F.2d 872 (8th Cir.

1993) (finding that § 108.7 is "probably the most persuasive evidence that

[FECA's  preemption  provision] was intended to preempt all state laws purporting

to regulate congressional campaign expenditures"). Because the Voter

Transportation Law attempts to regulate permissible expenditures in federal

elections, plaintiffs contend that it is expressly preempted. (ECF No. 17, ¶¶ 44-

47). Given the plausible conflict between FECA's express preemption of state

laws on political expenditures and the Transportation Law's limitation on

expenditures for transportation to the polls, which is a permissible expenditure in

federal elections, plaintiffs have stated a claim for express preemption.

Plaintiffs have also stated a claim for conflict preemption. Plaintiffs point to

two federal regulations promulgated pursuant to FECA expressly permitting

disbursements to provide transportation to the polls for voters. 11 C.F.R.

§ 114.3(c)(4)(i) (permitting corporations to make disbursements to provide transportation to the polls for certain employees and establishing the scope of permissible express advocacy); *id*. § 114.4(d)(1) (permitting corporations to make disbursements to provide transportation to the polls for the general public and employees outside the restricted class covered by 11 C.F.R. § 114.3).  Plaintiffs concede that the text of these regulations permits corporations to "provide" transportation, significantly, it does so in the context of making "disbursements," that is, spending money, to provide these services.  Accordingly, the court agrees with plaintiffs that they have stated claim for preemption based on the plausibly alleged conflict between the Voter Transportation Law and the federal regulations allowing corporations to use funds to provide transportation to the polls.

   C.   <u>Declaratory Relief</u>

   Defendant asserts that plaintiffs have not sufficiently alleged that a prosecution by the Attorney General, or any local prosecutor for that matter, is imminent or likely to come to pass under § 931(1)(f) or § 759(3)(8), and therefore, this case is not ripe for a pre-enforcement review under the Declaratory Judgment Act.  *See United Steelworkers of America, Local 2116 v. Cyclops Corp*., 860 F.2d 189, 194 (6th Cir.1988) (articulating factors to consider regarding ripeness). Defendant also argues that the factual record in this case is not sufficiently developed to permit a fair and complete hearing as to plaintiffs' prospective claims

as to these statutes. *Id*. And finally, no significant hardship will result to plaintiffs should this Court refuse to consider these prospective claims. *Id*.

In response, plaintiffs maintain that they have alleged an ongoing injury in that the challenged laws have and will force them to divert resources, (ECF No. 17, ¶ 25), and that the challenged laws have chilled conduct in which plaintiffs would have otherwise engaged. (ECF No. 17, ¶¶ 7–17, 24–26). That ongoing impact makes plaintiffs' claims ripe for review. Plaintiffs also contend that defendant misconstrues the purpose of the Declaratory Judgment Act. As Justice Rehnquist noted, "the declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity." *Steffel v. Thompson*, 415 U.S. 452, 480 (1974) (Rehnquist, J., concurring). The law does not "require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction." *MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 129 (2007). In such cases, plaintiffs can eliminate the threat of prosecution by not doing what they claim the right to do, but that "[does] not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced." *Id*. The "very purpose" of the Declaratory Judgment Act is to ameliorate "[t]he dilemma posed by that

coercion—putting the challenger to the choice between abandoning his rights or risking prosecution." *Id*. at 130 (internal quotation marks omitted).

In the court's view, plaintiffs' argument carries the day. As the Sixth Circuit has held, pre-enforcement review is usually granted under the Declaratory Judgment Act when a statute "imposes costly, self-executing compliance burdens or if it chills protected First Amendment activity." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) (quoting *Minnesota Citizens Concerned for Life v. Federal Election Comm'n*, 113 F.3d 129, 132 (8th Cir. 1997)). The Declaratory Judgment Act provides federal courts with the discretion to "declare the rights and other legal relations of any interested party seeking such declaration...." *Louisville City Sch. Dist. Bd. of Educ. v. Ohio Ass'n of Pub. Sch. Employees (OAPSE)/AFSCME Local 4 AFL-CIO*, 2020 WL 1930131, at *4 (N.D. Ohio Apr. 21, 2020); 28 U.S.C. § 2201(a). But the Declaratory Judgment Act does not "create an independent basis for federal subject matter jurisdiction." *Heydon v. MediaOne of Se. Mich., Inc.*, 327 F.3d 466, 470 (6th Cir. 2003). The Declaratory Judgment Act provides that a district court may declare the rights and legal relations of the parties, so long as there is an "actual controversy...." 28 U.S.C. § 2201(a). "The 'actual controversy' requirement under the Declaratory Judgment Act is coextensive with Article III's case or controversy requirement." *Hayden v. 2K Games, Inc.*, 375 F. Supp. 3d 823, 829 (N.D. Ohio 2019) (citing *Teva Pharm.*

*USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1338 (Fed. Cir. 2007)).  As

such, federal courts must ensure that all suits, including those seeking a declaratory

judgment, satisfy the longstanding justiciability requirements of standing, ripeness,

and mootness.  *See Nat. Rifle Ass'n of Am. v. Magaw*, 132 F.3d at 279-80.  As set

forth above in great detail, the court has already assessed that plaintiffs have

sufficiently alleged standing in this matter.  Defendant's perfunctory argument that

the claims before this Court are not ripe have already been addressed above in the

context of standing.  Contrary to defendant's argument, plaintiffs are not required

to risk prosecution (in order to presumably "develop" the record) when they have

sufficiently alleged that they are refraining from protected First Amendment

activity, as proscribed by the statutes at issue in this case.

 Accordingly, for the reasons set forth above, defendant's motion to dismiss

the amended complaint is **GRANTED** in part and **DENIED** in part.  Counts III

and VII are **DISMISSED** and all remaining counts are left intact.

 **IT IS SO ORDERED**.

Date: May 22, 2020       s/Stephanie Dawkins Davis
           Stephanie Dawkins Davis
           United States District Judge