UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PRIORITIES USA, *et al.*,                              Case No. 19-13341

      Plaintiffs                                   Stephanie Dawkins Davis
v.                                                     United States District Judge

DANA NESSEL,

      Defendant.
_____/

## ORDER DENYING IN PART AND GRANTING IN PART
## MOTION FOR PRELIMINARY INJUNCTION (Dkt. 22)

## I.     PROCEDURAL HISTORY

Plaintiff, Priorities USA, originally filed this action challenging two

Michigan statutes, one governing the handling of absentee ballot applications in

Michigan and the other governing transportation to polling places.  (ECF No. 1).

On January 27, 2020, plaintiffs filed an amended complaint, adding two additional

plaintiffs, Rise, Inc. and Detroit/Downriver Chapter of the A. Philip Randolph

Institute (DAPRI).  (ECF No. 17).  Defendant Nessel filed a motion to dismiss the

amended complaint on February 10, 2020.  (ECF No. 27).  After oral argument, the

Attorney General's motion to dismiss was granted in part and denied in part.  (ECF

No. 59).  The court also heard and granted motions to intervene in this matter by

the Michigan Republican Party and the Republican National Committee (the

1

Republican Party) and the Michigan Senate and Michigan House of Representatives (the Legislature).  (ECF Nos. 33, 39, 60).

Plaintiffs filed the instant motion for preliminary injunction to which the Attorney General responded.  (ECF Nos. 22, 30).  Upon their entry into the case, the court also permitted the Intervenors to file responses to the motion for preliminary injunction, which they did on June 5, 2020.  (ECF Nos. 68, 70).  Plaintiffs filed replies to all response briefs.  (ECF Nos. 41, 73).  The court held a hearing via video on July 14, 2020, pursuant to notice.  (ECF No. 74).

For the reasons the follow, the court **DENIES** plaintiffs' motion for preliminary injunction with respect the Absentee Ballot Law and **GRANTS** the request for preliminary injunction regarding the Voter Transportation Law.

## II.    FACTUAL BACKGROUND

Priorities USA is a 501(c)(4) nonprofit corporation, self-described as a "voter-centric progressive advocacy and service organization."  (ECF No. 17, PageID.92, ¶ 7).  Its "mission is to build a permanent infrastructure to engage Americans by persuading and mobilizing citizens around issues and elections that affect their lives."  *Id*.  It engages in activities to "educate, mobilize, and turn out voters" in Michigan, and "expects to" make expenditures and contributions towards those objectives in upcoming Michigan state and federal elections.  *Id*.

Rise is also a 501(c)(4) nonprofit organization.  It "runs statewide advocacy and voter mobilization programs in Michigan and California, as well as on a number of campuses nationwide."  (ECF No. 17, PageID.93, ¶ 8).  Rise asserts that "efforts to empower and mobilize students as participants in the political process ... are critical to Rise's mission because building political power within the student population is a necessary condition to achieving its policy goals."  *Id*.  Rise launched its second state-specific campaign in Michigan in 2019; it has eleven student organizers who are paid to organize their campuses around voter education and turnout activities.  Rise plans to continue this program through the 2020 election.  *Id*. at 9.  This effort has included and will continue to include engaging fellow students in grassroots voter education, registration, and turnout activities, including on-campus, get-out-the-vote drives and canvasses.  *Id.*

DAPRI is a local (Detroit) chapter of the A. Philip Randolph Institute, a national 501(c)(3) nonprofit organization.  It is a membership organization "with a mission to continue to fight for Human Equality and Economic Justice and to seek structural changes through the American democratic process."  (ECF No. 17, PageID.95, ¶ 14).  Its members are "involved in voter registration, get-out-the-vote activities, political and community education, lobbying, legislative action, and labor support activities in Michigan.  *Id*.  As part of its get-out-the-vote activities, DAPRI's members have "provided rides" to and from the polls for community

members on election day; the organization intends to continue this practice and to expand this work in future elections. *Id*. at ¶ 16. DAPRI acknowledges that Proposal 3, which passed in 2018, makes absentee voting available to all and says that it would like to educate voters about the opportunity to vote absentee. (ECF No. 17, PageID.96, ¶ 17).

All three non-profit corporations challenge what they refer to as Michigan's "Absentee Ballot Organizing Ban" (hereinafter the "Absentee Ballot Law") (Mich. Comp. Laws § 168.759(4), (5), (8)) (*see* ECF No. 17, PageID107-112, ¶¶ 48-55) and its "Voter Transportation Ban" (hereinafter the "Voter Transportation Law") (Mich. Comp. Laws § 168.931(1)(f)) (*see* ECF No. 17 PageID.101-107, ¶¶ 33-47). Specifically, they contend that the Absentee Ballot Law is (1) unconstitutionally vague and overbroad under the First and Fourteenth Amendments (Count I); (2) violative of their Speech and Association rights under the First and Fourteenth Amendments (Count II); and (3) preempted by Section 208 of the Voting Rights Act of 1965 (Count IV). Similarly, they assert that the Voter Transportation Law is (1) unconstitutionally vague and overbroad under the First and Fourteenth Amendments (Count V); (2) violative of their Speech and Association rights under the First and Fourteenth Amendments (Count VI); and (3) preempted by Section 208 of the Voting Rights Act of 1965 (Count VIII). (ECF No. 17). The court

previously dismissed plaintiffs' claims that the laws place an undue burden on the fundamental right to vote (Counts III and VII).  (ECF No. 59).

## III.   STATUTORY SCHEMES

### A.   Absentee Ballot Law, Mich. Comp. Laws § 168.759

Michigan's Absentee Ballot Law provides that a voter must request an application and submit that application to the voter's local clerk in order to receive an absentee voter ("AV") ballot.  For both primaries and regular elections, an elector may apply for an AV ballot at any time during the 75 days leading up to the primary or election until 8 p.m. on the day of the primary or election.  Mich. Comp. Laws § 168.759(1)-(2).  In either case, "the elector shall apply in person or by mail with the clerk" of the township or city in which the elector is registered. *Id*.  Subsection 759(3) provides that:

> (3) An application for an absent voter ballot under this section may be made in any of the following ways:
>
> (a) By a written request signed by the voter.
>
> (b) On an absent voter ballot application form provided for that purpose by the clerk of the city or township.
>
> (c) On a federal postcard application.
>
> (4) An applicant for an absent voter ballot shall sign the application. A clerk or assistant clerk shall not deliver an absent voter ballot to an applicant who does not sign the application. A person shall not be in possession of a signed absent voter ballot application except for the

5

applicant; a member of the applicant's immediate family; a person residing in the applicant's household; a person whose job normally includes the handling of mail, but only during the course of his or her employment; a registered elector requested by the applicant to return the application; or a clerk, assistant of the clerk, or other authorized election official. A registered elector who is requested by the applicant to return his or her absent voter ballot application shall sign the certificate on the absent voter ballot application.

(5) The clerk of a city or township shall have absent voter ballot application forms available in the clerk's office at all times and shall furnish an absent voter ballot application form to anyone upon a verbal or written request.

Mich. Comp. Laws §§ 168.759(3)-(5)

Where a form application is used, under § 759(5), the "application shall be in substantially the following form." The statute then provides the body of the form and includes a general "warning" and a "certificate" portion for "a registered elector" delivering a completed application for a voter. Mich. Comp. Laws § 168.759(5). The warning must state that:

It is a violation of Michigan election law for a person other than those listed in the instructions to return, offer to return, agree to return, or solicit to return your absent voter ballot application to the clerk. An assistant authorized by the clerk who receives absent voter ballot applications at a location other than the clerk's office must have credentials signed by the clerk. Ask to see his or her credentials before entrusting your application with a person claiming to have the clerk's authorization to return your application.

*Id*.

Similarly, the certificate for a registered elector returning an AV ballot application must state that:

> I am delivering the absent voter ballot application of [the named voter] at his or her request; that I did not solicit or request to return the application; that I have not made any markings on the application; that I have not altered the application in any way; that I have not influenced the applicant; and that I am aware that a false statement in this certificate is a violation of Michigan election law.

*Id*.

Under § 759(6), the application form must include the following instructions to the applicant:

> Step 1. After completely filling out the application, sign and date the application in the place designated. Your signature must appear on the application or you will not receive an absent voter ballot.

> Step 2. Deliver the application by 1 of the following methods:

> (a) Place the application in an envelope addressed to the appropriate clerk and place the necessary postage upon the return envelope and deposit it in the United States mail or with another public postal service, express mail service, parcel post service, or common carrier.

> (b) Deliver the application personally to the clerk's office, to the clerk, or to an authorized assistant of the clerk.

> (c) In either (a) or (b), a member of the immediate family of the voter including a father-in-law, mother-in-law,

> brother-in-law, sister-in-law, son-in-law, daughter-in-law, grandparent, or grandchild or a person residing in the voter's household may mail or deliver the application to the clerk for the applicant.
>
> (d) If an applicant cannot return the application in any of the above methods, the applicant may select any registered elector to return the application.  The person returning the application must sign and return the certificate at the bottom of the application.

Mich. Comp. Laws § 168.759(6).

Consistent with these statutes, § 759(8) provides that "[a] person who is not authorized in this act and who both distributes absent voter ballot applications to absent voters and returns those absent voter ballot applications to a clerk or assistant of the clerk is guilty of a misdemeanor."  Mich. Comp Laws § 168.759(8).  Section 931 also provides for penalties associated with distributing and returning AV ballot applications.  *See* Mich. Comp. Laws §§ 168.931(1)(b)(iv) and (1)(n).

Based on these provisions, there are two ways to apply for an absentee voter ballot: (1) a written request signed by the voter, and (2) on an absentee voter ballot application form provided for that purpose and signed by the voter.  In either case, the voter applies by returning his or her preferred mechanism – a written request or form application – to the voter's local clerk in person or by mail.  Mich. Comp. Laws §§ 168.759(1), (2), (6).  For several years, the Secretary of State has also instructed Clerks to accept applications sent by facsimile and email.  Voters who

cannot turn in their application in person, cannot mail their application or return it by email or facsimile, may have an immediate family member or a person residing in the voter's household deliver their application, or may request another registered voter to return the application on their behalf.  Mich. Comp. Laws §§ 168.759(4), (5), (6).  In short, only persons authorized by law, i.e. those described in § 759(4), may return a signed application for an absentee voter ballot to a local clerk.  Mich. Comp. Laws §§ 168.759(4)-(5).

Plaintiffs assert that the restrictions contained in the Absentee Ballot Law inhibit their ability to organize around absentee voting.  DAPRI encourages voters to vote absentee when they work far away from home and getting to the polls on election day would be prohibitively time consuming.  (ECF No. 22-5, Hunter Decl. ¶ 16).  And both DAPRI and Rise have a programmatic focus of encouraging college students to vote absentee.  (ECF No. 22-5, Hunter Decl. ¶ 16; ECF No. 22-6, Lubin Decl. ¶¶ 3, 24, 26).  Rise encourages absentee voting because convenience is a significant factor in youth voting.  (ECF No. 22-6, Lubin Decl. ¶¶ 22, 24; ECF No. 22-7, Palmer Decl. ¶ 19).  Plaintiffs have found that between classes, studying, extracurriculars, and a lack of access to private transportation, voting in person on election day is decidedly difficult for college students.  (ECF No. 22-6, Lubin Decl. ¶¶ 20, 22-23; ECF No. 22-7, Palmer Decl. ¶ 19 (study showed 40+ percent of young voters who did not vote in 2016 cited being too

busy)).  DAPRI also encourages college students who are registered to vote at home but attend college in another part of Michigan to vote absentee, for example a student in Detroit who is registered to vote in the Upper Peninsula.  (ECF No. 22-5, Hunter Decl. ¶ 16).  Election officials in Michigan widely expected absentee voting numbers to surge in the presidential primary and expect the same in the 2020 general election, the first federal elections in which no-excuse absentee voting will be available to all Michigan voters.  *See* Ashley Schafer, *City preps for uptick of absentee voters*, Midland Daily News, Nov. 22, 2019; Jackie Smith, *Clerks prepare to handle spike in absentee voters in March presidential primary election*, Port Huron Times Herald, Dec. 10, 2019.  Yet, plaintiffs maintain that the Absentee Ballot Law unduly limits the ability of organizations like theirs to persuade and encourage Michigan voters to apply for absentee ballots and makes it more difficult for voters to apply for absentee ballots.

B.     Voter Transportation Law, Mich. Comp. Laws § 168.931(1)(f)

The Voter Transportation Law can be found at Mich. Comp. Laws § 168.931, and provides, in relevant part:

> (1) A person who violates 1 or more of the following subdivisions is guilty of a misdemeanor:
>
> * * *
>
> (f) A person shall not hire a motor vehicle or other conveyance or cause the same to be done, for conveying voters, other than voters physically unable to walk, to an election.

Mich. Comp. Laws § 168.931(1)(f) (hereinafter "Voter Transportation Law").

Thus, under this provision, a person cannot pay for the transportation of a voter to

the polls unless the voter is physically unable to walk.  This language has existed

in some form since 1895, *see* 1895 P.A. 35, and has been a part of Michigan's

modern election law since it was reenacted in 1954 P.A. 116.  It was amended by

1982 P.A. 201 to replace the term "carriage" with the current term "motor

vehicle."

According to plaintiffs, transportation to and from the polls can be a

determinative factor in whether many voters, especially students and hourly

workers, make it to the polls.  (ECF No. 22-5, Hunter Decl. ¶¶ 8-9; ECF No. 22-6,

Lubin Decl. ¶ 23; ECF 22-7, Palmer Decl. ¶ 19 (study showed that 29 percent of all

young voters and 38 percent of young voters of color cited lack of transportation as

a factor in why they did not vote)).  Advocacy organizations like plaintiffs provide

rides to the polls as a central part of their organizing efforts.  (ECF No. 22-5,

Hunter Decl. ¶¶ 6–11; ECF No. 22-6, Lubin Decl. ¶ 24; ECF No. 22-8, Ufot Decl.

¶¶ 3-11).  The Voter Transportation Law limits options for any organization

seeking to transport voters in Michigan.  Providing rides to the polls is a key

organizing tactic for political and advocacy organizations like plaintiffs, as it helps

to encourage voters to participate in the political process and helps communities

traditionally underrepresented at the polls build their political power.  (ECF No.

22-5, Hunter Decl. ¶¶ 5-6; ECF No. 22-6, Lubin Decl. ¶¶ 3, 12, 18; ECF No. 22-8, Ufot Decl. ¶¶ 3-11).  Hence, plaintiffs seek to enjoin enforcement of the referenced statutes.

## IV.   ANALYSIS

### A.   Preliminary Injunction Standard

In determining whether injunctive relief is proper, the court considers four factors: (1) whether plaintiffs have a strong likelihood of success on the merits; (2) whether plaintiff has shown that irreparable injury will occur without an injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.  *See Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005).  Although no single factor is controlling, the likelihood of success on the merits is often the predominant consideration.  *Gonzales v. National Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) ("[A] finding that there is simply no likelihood of success on the merits is usually fatal.").

Plaintiffs bear the burden of demonstrating entitlement to an injunction, and the burden is a heavy one because injunctive relief is "an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."  *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  Indeed, the "proof required for the

plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000); *see also McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) ("The proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion because a preliminary injunction is an extraordinary remedy."). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Hamad v. Woodcrest Condo. Ass'n,* 328 F.3d 224, 230 (6th Cir. 2003) (quoting *Michigan Bell Telephone Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001)). A plaintiff must always, however, show irreparable harm before a preliminary injunction may issue. *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982).

    B.    <u>Likelihood of Success on the Merits</u>

        1.    *The Absentee Ballot Law*

            a.    First Amendment, U.S Const, amend I.

"The First Amendment, applicable to the States through the Fourteenth Amendment, provides that 'Congress shall make no law ... abridging the freedom of speech.'" *Virginia v. Black*, 538 U.S. 343, 358 (2003). The First Amendment generally mandates "'that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *United States v.*

*Stevens*, 559 U.S. 460, 468 (2010) (quoting *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002)).  Plaintiffs contend the requirement that only voters registered in Michigan can assist voters in submitting absentee ballot applications (other than family or household members) violates the First Amendment because it prohibits only certain persons -- individuals who are not registered to vote in Michigan -- from engaging in core political expression.  The Absentee Ballot Law also proscribes non-family or household members from soliciting or requesting to help a voter to return an absentee ballot application. Mich. Comp. Laws § 168.759(4), (5).  According to plaintiffs, this solicitation ban is also subject to strict scrutiny because it (1) operates differently based on the identity of the speaker; (2) acts as a content-based restriction on speech; (3) proscribes political expression; and (4) regulates core political expression.  As explained in *Project Veritas v. Ohio Election Comm'n*, 418 F.Supp.3d 232, 245 (S.D. Ohio 2019), "the Supreme Court and the Sixth Circuit have considered facial challenges under the First Amendment that … were not overbreadth challenges; instead, the courts considered whether the regulations were content-based or otherwise restricted protected activity."  *See R.A.V. v. City of St. Paul, Minn*., 505 U.S. 377 (1992) (holding ordinance facially unconstitutional because it prohibited speech based on content and declining to consider overbroad argument); *John Doe No. 1 v. Reed*, 561 U.S. 186 (2010) (applying First Amendment "exacting scrutiny"

in facial challenge to compelled disclosure of signatory information on referendum petitions); *Susan B. Anthony List v. Driehaus*, 814 F.3d 466 (6th Cir. 2016) (applying strict scrutiny to facial challenge of Ohio false statement laws as content-based restrictions); *Schmitt v. LaRose*, 933 F.3d 628 (6th Cir. 2019) (holding ballot-initiative process not a prior restraint in facial challenge to statute under First Amendment and analyzing under *Anderson-Burdick* framework).  Plaintiffs do not appear to be making a First Amendment overbreadth challenge, and accordingly, the Court will determine if the challenged provisions of the Absentee Ballot Law present unconstitutional content-based restrictions.

The parties continue to disagree on whether the Absentee Ballot Law implicates the First Amendment and accordingly, the appropriate standard governing the court's inquiry.  In its Order Denying Defendant's Motion to Dismiss the Amended Complaint ECF No. 59), the court concluded that exacting scrutiny applied to this inquiry.  Ultimately, the court found the rationale in *League of Women Voters v. Hargett*, 400 F.Supp.3d 706 (M.D. Tenn. 2019) persuasive. *Hargett* concluded that encouraging others to register to vote is "pure speech" and because that speech is political in nature, it is "core First Amendment activity." This court concluded that unlike cases involving the mere administrative process or the mechanics of the electoral process, the Absentee Ballot Law, as interpreted by plaintiffs and as set forth in the amended complaint, involves the regulation of

political speech.  This court found little difference between discussions of whether to register to vote and discussions of whether to vote absentee.  (ECF No. 59).

The Intervenors have brought forward several cases that call into question this aspect of the court's earlier decision and seek to distinguish the present circumstances from *Hargett*.  Like *Hargett*, none of the cases the Intervenors cite are precedential, but the court will, nonetheless, give them due consideration.  In *American Ass'n of People With Disabilities v. Herrera*, 580 F.Supp.2d 1195, 1203 (D. N.M. 2008), the plaintiff challenged a regulatory scheme that restricts third-party voter registration in various ways, and places affirmative requirements on parties wishing to engage in third-party voter registration in the following ways: (i) requiring that registration agents complete a pre-registration process and provide personal information; (ii) limiting the number of registration forms an organization or individual may receive; (iii) requiring that third-party registration agents return completed registration forms to the county clerk or Secretary of State within forty-eight hours; and (iv) applying criminal and civil penalties for parties who do not comply with third-party registration laws.  The *Herrera* court opined however, that none of the challenged restrictions concerned or affected the content of any speech by third-party voter registration organizations.  *Id*. at 1214.  More specifically, the court observed that the New Mexico statute did not "mandate any particular speech or statement or information" and did not preclude any speech.  Indeed, the state

conceded that the third-party registration agent could intentionally lie, deceive or provide fraudulent information and the law would not penalize that agent in any way.  Yet, the statutory scheme at issue in *Herrera* is plainly distinguishable from § 759, which prohibits a large sector of Michigan electors and all non-Michigan electors from requesting or soliciting a person to return their absentee ballot application.  Requesting and soliciting describe the content of the prohibited communication.  Accordingly, the court does not find *Herrera* to be persuasive or meaningfully analogous to the present circumstances.

Next, the Intervenors point to *Voting for America, Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013), in which the plaintiff organizations challenged various provisions of Texas's law governing volunteer deputy registrars (VDR Law). Specifically, they challenged (1) the provision forbidding non-Texas residents from serving as VDRs, (2) the provision forbidding VDRs of one county from serving in another county; (3) the compensation provision; (4) the photocopying prohibition; and (5) the prohibition on VDRs sending completed registration applications via US mail –  requiring personal delivery instead.  The Fifth Circuit observed that some voter registration activities involve speech – including urging citizens to register, distributing voter registration forms, helping voters fill out forms, and asking for information to verify the registrations were processed successfully.  *Id.* at 389.  But the court concluded that the challenged provisions

17

could easily be separated from the speech aspects of voter registration activities.

Out-of-state or out-of-county canvassers can participate anywhere, in any capacity,

except to perform the functions exclusively assigned to trained volunteer VDRs:

collecting, reviewing for completeness, issuing a receipt, and delivering the

completed voter registration forms to a county office.  Thus, the court concluded

that the challenged provisions were not based on speech.  Unlike the organization

in *Steen*, no members of plaintiffs here can assist with or return absentee ballot

applications even if they are Michigan electors unless they are asked to do so

because they are prohibited from asking to do so, an act which necessarily involves

speech by the organizations.  Indeed, the *Steen* court distinguished *Buckley/Meyer*[1]

because those cases involved laws that regulated "the process of advocacy itself,

dictating who could speak (only unpaid circulators and registered voters) or how to

go about speaking (with name badges and subsequent detailed reports)."  *Id*. at

390.  In contrast, the Absentee Ballot Law plainly regulates who can speak (only

Michigan electors or family or household members of the applicant) and what they

may say.

The Intervenors also cite *League of Women Voters of Florida v. Browning*,

575 F.Supp.2d 1298 (S.D. Fla. 2008), in which the plaintiffs challenged certain

---

[1] *Meyer v. Grant*, 486 U.S. 414 (1988) and *Buckley v. American Constitutional Law Foundation, Inc*., 525 U.S. 182 (1999).

18

aspects of the Florida third-party organization voter registration law, including

certain deadlines and reporting requirements that could result in fines for those

who failed to comply.  In *Browning,* the plaintiffs claimed that certain aspects of

Florida's statutory scheme were vague and imposed an unconstitutional burden on

their political speech and association rights.  Notably, the court acknowledged that

the plaintiffs' "interactions with prospective voters in connection with their

solicitation of voter registration applications constitutes constitutionally protected

activity." *Id*. at 1321.  Yet, the challenged provisions of the statutory scheme,

unlike those in *Meyer* and *Schaumburg*, "did not place any direct restrictions or

preconditions on those interactions."  *Id*. at 1322.  The court further explained:

> For instance, it does not place any restrictions on who is
> eligible to participate in voter registration drives or what
> methods or means third-party voter registration
> organizations may use to solicit new voters and distribute
> registration applications.  Instead, the Amended Law
> simply regulates an administrative aspect of the electoral
> process—the handling of voter registration applications
> by third-party voter registration organizations after they
> have been collected from applicants. Thus, the impact of
> this regulation on Plaintiffs' "one-to-one,
> communicative" interactions with prospective voters is
> far more indirect and attenuated than the statute
> addressed in *Meyer*.

*Id*.  In contrast, § 759 does place restrictions on who may participate in certain

aspects of voter registrations drives -- only Michigan electors who are also family

or household members of the applicant may solicit or request to return absentee

ballot applications. In *Browning*, the court was able to separate the speech aspects of the voter registration drive – any person or organization can use any method to solicit new voters and distribute applications – from the regulated handling of the voter registration applications after they have been collected from the applicants. Here, however, it is impossible to separate the ban on possessing and returning applications to vote absentee from the ban on soliciting or requesting to return absentee ballot applications.

Finally, the Intervenors cite *Democratic Nat'l Comm. v. Reagan*, 329 F.Supp.3d 824, 851 (D. Ariz. 2018), rev'd and remanded on other grounds sub nom. *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020) (*en banc*), cert. petition pending, in which the plaintiffs challenged a law prohibiting third-party collection of early ballots. The court found that the law only minimally burdened the voters' voting rights and associational rights. While the court discussed the free speech aspects of *Steen*, *supra*, it did not address, nor did the plaintiffs assert, any burden on free speech. Accordingly, this case is largely inapposite.

In short, none of the cases cited cause the court to reverse its earlier conclusion that exacting scrutiny applies to plaintiffs' First Amendment challenge to this law, as explained in *Hargett*. The court remains convinced that there is little difference between discussions about whether to register to vote and whether to

register to vote absentee.  Indeed, under the current circumstances in this state and throughout the nation – where a global pandemic causes many Michigan voters, particularly those with certain underlying medical conditions, to question the safety of voting in person – discussions about whether and how to vote absentee are especially critical and certainly "implicate[] political thoughts and expression" both on the part of applicant and on the part of the third-party organizations seeking to assist voters with this process.  *Hargett*, at 724 (quoting *Buckley v. American Constitutional Law Foundation, Inc*., 525 U.S. 182, 195 (1999)). However, whether the court applies exacting scrutiny or a rational basis standard of review, on the record before the court and as discussed in detail below, the Absentee Ballot Law is constitutional.

To withstand exacting scrutiny, the challenged provisions of the Absentee Ballot Law must have a substantial relationship to a "sufficiently important" governmental interest.  *Citizens United v. FEC*, 558 U.S. 310, 340 (2010).  And, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *John Doe #1 v. Reed*, 561 U.S. 186, 196 (2010).

Plaintiffs maintain that the registration requirement for those who would return AV ballot applications is not fairly designed to serve any important government interest.  They compare the registration requirement to the law struck

down by the Supreme Court in *Buckley*, which allowed only registered voters to circulate initiative petitions because it was likely to result in "speech diminution." *Id*. at 193-194.  There, the record showed that there were 400,000 voting eligible persons who were not registered to vote.  *Id*. at 193.  The Supreme Court therefore concluded that "[b]eyond question, Colorado's registration requirement drastically reduces the number of persons, both volunteer and paid, available to circulate petitions."  *Id*. at 193.  Plaintiffs say there are at least 750,000 persons who are eligible to vote but are not registered to vote residing in Michigan.  (ECF No. 22-7, Palmer Decl. ¶¶ 6-13).  Accordingly, plaintiffs assert that the registration requirement drastically reduces the number of persons who can return AV ballot applications and should suffer the same fate as the registration requirement struck down in *Buckley*.  Additionally, plaintiffs maintain that the ban on non-family or household members from soliciting or requesting to help a voter return an absentee ballot application cannot survive exacting scrutiny for the same reasons.  Plaintiffs argue that the solicitation ban burdens their ability to persuade Michigan voters to vote by absentee ballot, similar to the law struck down in *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 430 (1963).

Defendant and the Intervenors contend that the State has compelling interests in both preserving the integrity of elections and preventing fraud in the absentee voting process.  States have a "compelling interest in preserving the

integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Id*. "While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear." *Crawford v. Marion Cnty. Election Bd*., 553 U.S. 181, 196 (2008). In *John Doe No. 1 v. Reed*, 561 U.S. 186 (2010), the Supreme Court held that disclosure requirements of Washington's Public Records Act were sufficiently related to the state's interest in protecting the integrity of the electoral process to satisfy exacting scrutiny. The speakers whose First Amendment rights were at issue, were those who signed referendum petitions, which is expressive conduct under the First Amendment. *Id*. at 194-95. They sought to prohibit the state from making referendum petition signatory information available in response to the state's public records act. But the Court held that the state's interest in preserving the integrity of the electoral process by combating fraud was sufficiently important to satisfy exacting scrutiny. *Id*. at 197. "The State's interest is particularly strong with respect to efforts to root out fraud, which not only may produce fraudulent outcomes, but has a systemic effect as well: It 'drives honest citizens out of the democratic process and breeds distrust of our government.'" *Id*. (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)).

Importantly, in *Reed*, the Court found that the threat of fraud was not merely hypothetical. Indeed, the respondents and *amici* cited a number of petition-related cases of fraud across the country to support their point. *Id*. at 198. Similarly, here the Intervenors have cited cases from across the country in which courts have acknowledged that the absentee ballot process is susceptible to fraud, along with other supporting evidence. *See Crawford*, 553 U.S. at 195-96 (explaining history of in-person and absentee fraud "demonstrate[s] that not only is the risk of voter fraud real but that it could affect the outcome of a close election"); *Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004) ("Voting fraud is a serious problem in U.S. elections generally . . . and it is facilitated by absentee voting." (citing John C. Fortier & Norman J. Ornstein, *Symposium: The Absentee Ballot and the Secret Ballot: Challenges for Election Reform*, 36 U. Mich. J.L. & Reform 483 (2003))); *Qualkinbush v. Skubisz*, 826 N.E.2d 1181, 1197 (Ill. App. Ct. 2004) ("It is evident that the integrity of a vote is even more susceptible to influence and manipulation when done by absentee ballot."); Khan & Carson, *Comprehensive Database of U.S. Voter Fraud Uncovers No Evidence That Photo ID Is Needed*, https://votingrights.news21.com/article/election-fraud (study of election crimes from 2000-2012 finding that more fraud crimes involved absentee ballots than any other categories); *Veasey v. Abbott*, 830 F.3d 216, 256 (5th Cir. 2016) ("The

district court credited expert testimony showing mail-in ballot fraud is a significant threat—unlike in-person voter fraud.").[2]

Further, while Michigan has a number of laws criminalizing interference with the absentee voting process, including making it a felony to forge a signature on an absentee ballot application, none of these laws are primarily designed to reduce fraud or abuse in the application process on the front end, as opposed to simply punishing it after it occurs.  The Absentee Ballot Law is designed with fraud prevention as its aim and it utilizes well-recognized means in doing so.  As explained by the Legislature, "[b]y regulating the distribution and collection of absentee ballot applications and limiting those who are permitted to transport the applications, the state increases accountability and protects against instances of carelessness."  (ECF No. 68, PageID.1174).  In this vein, the *Browning* court recognized several potential abuses with third-party collection of absentee-ballot applications, ranging from "hoard[ing]" applications, to "fail[ing] to submit applications" by the deadline, to "fail[ing] to submit applications at all." *Browning*, 575 F.Supp.2d at 1324.[3]

---

[2] In acknowledging the findings contained in the authorities cited by the intervenors about the greater susceptibility to fraud in the absentee voter context, the court does not find or suggest that there has been any showing of a greater incidence of fraud in the absentee voting process in Michigan.

[3] At least one report, the Carter-Baker Commission report which was put together by a group headed by former president Jimmy Carter and former Secretary of State James Baker, states that "[a]bsentee ballots remain the largest source of potential voter fraud. . . . States

The Legislature also makes the point that, "only allowing registered electors to transport absentee ballot applications, Section 759 ensures that the person is a civic-minded individual, whose information is already on record with the state, and who is subject to subpoena power in Michigan." (ECF No. 68, PageID.1174). Similarly, by requiring that the voter "request" assistance from anyone other than a relative or house-hold member, it creates a greater likelihood that the registered elector is someone the voter trusts. The court is convinced that these checks are designed to promote accountability on the part of those handling the applications and faith in the absentee-voting system. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. at 197 ("[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process."); (ECF No. 70-5, the Carter-Baker Commission report) (The "electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters.").

The burden imposed on plaintiffs is that they may not engage in speech (§ 759(5)) that would facilitate the collection and return of signed absentee ballot

---

therefore should reduce the risks of fraud and abuse in absentee voting by prohibiting 'third-party' organizations, candidates, and political party activists from handling absentee ballots." (ECF No. 70-5, Ex. 4, Building Confidence in U.S. Elections: Report of the Commission on Federal Election Reform, p. 46 (Sept. 2005)). While the report specifically refers to the handling of ballots by third-party organizations, it logically follows that precluding such organizations from handling absentee voter applications may also limit the opportunities for fraud and abuse in the application process.

applications from Michigan voters, which they are otherwise banned from possessing (§ 759(4)) and banned from returning to the clerk (§ 759(8)).  Because of the organizations' aims to encourage civic engagement and empower voters through use and facilitation of the absentee ballot process, this restriction is not slight.  However, plaintiffs can still educate the public about registering to vote absentee and answer questions about this process.  Moreover, nothing in the law restricts plaintiffs from providing a pool of electors that can return the ballots for them *when requested by voters*.  Additionally, § 759 provides a number of ways for voters to return their requests for an application or their applications to the local clerk:  (1) in person, (2) by US mail or some other mail service, (3) email, (4) fax, (5) through in-person, mail, or other delivery by an immediate family member, which includes in-laws and grandchildren, (6) through in-person, mail, or other delivery by a person residing in the same household, and (7) if none of those methods are available, through in-person, mail, or other delivery "by any registered elector."  Mich. Comp. Laws § 168.759(4)-(6).  The question is whether there is a substantial relationship between the level of burden imposed on plaintiffs' speech rights and the sufficiently important governmental interests identified by defendant and the Intervenors.  The court finds that the state and intervenors have presented adequate evidence to demonstrate that the state's interests in preventing fraud and abuse in the absentee ballot application process and maintaining public confidence

27

in the absentee voting process are sufficiently important interests and are substantially related to the limitations and burdens set forth in § 759.  As such, the court concludes that plaintiffs are unlikely to success on their First Amendment challenge to the Absentee Ballot Law.

    b.    Unduly Vague and Overbroad

Plaintiffs also complain that it is not clear from the face of the statute whether soliciting includes passive conduct that induces a voter to entrust her absentee ballot application to a third party and offers of assistance that do not explicitly involve a request.  Several statutory provisions are implicated by plaintiffs' claim.  First, § 759(4) provides that a person must not possess an absentee voter ballot application unless they are a "registered elector requested by the applicant to return the application."  Subsection § 759(5) requires the registered elector to certify that he or she is delivering the absentee voter ballot application at the request of the applicant, that he or she "did not solicit or request to return the application," and that he or she did not "influence[] the application."  Subsection § 759(8) provides that "[a] person who is not authorized in this act and who both distributes absent voter ballot applications to absent voters and returns absent voter ballot applications to a clerk or assistant of the clerk is guilty of a misdemeanor."

Defendant maintains that the conduct being prohibited is plain and clear. One must not "solicit or request" to return an absentee ballot application.

Defendant asserts that the words "solicit" and "request" are not ambiguous or vague and are readily understood in their ordinary and common meaning. Simply put, according to defendant, the statute prohibits a person from asking to return an absentee ballot application.

"[B]asic principles of due process set an outer limit for how vague a statutory command can be if a person is going to be expected to comply with that command." *Hargett*, at 727 (citing *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 894 F.3d 235, 251 (6th Cir. 2018)). Specifically, a statute is unconstitutionally vague under the Fourteenth Amendment if its terms "(1) 'fail to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or (2) 'authorize or even encourage arbitrary and discriminatory enforcement.'" *Id*. at 246 (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). "'[A] more stringent vagueness test should apply' to laws abridging the freedom of speech ...." *Id*. (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)). That standard can be "relaxed somewhat" if the law at issue "imposes civil rather than criminal penalties and includes an implicit scienter requirement." *Id*. (citing *Hoffman Estates*, 455 U.S. at 499). Federal courts must construe challenged state statutes, whenever possible, "to avoid constitutional difficulty." *Green Party of Tenn. v. Hargett*, 700 F.3d 816, 825 (6th Cir. 2012). The Sixth Circuit has stated

that a statute will be struck down as facially vague only if the plaintiff has

"demonstrate[d] that the law is impermissibly vague in all of its applications." *Id*.

"When the common meaning of a word provides adequate notice of the

prohibited conduct, the statute's failure to define the term will not render the

statute void for vagueness." *United States v. Hollern*, 366 Fed. Appx. 609, 612

(6th Cir. 2010). Stated differently, where the challenged language "is commonly

used in both legal and common parlance," it often will be "sufficiently clear so that

a reasonable person can understand its meaning." *Deja Vu of Cincinnati, L.L.C. v.

Union Twp. Bd. of Trustees*, 411 F.3d 777, 798 (6th Cir. 2005) (*en banc*).

The language of § 168.759(4), (5) prohibits a person from "solicit[ing]" or

"request[ing] to return" an absentee voter ballot application. In interpreting this

language, the solicitation ban should be read in context with the ban on third-party

collection as a whole. "It is a 'fundamental canon of statutory construction that the

words of a statute must be read in their context and with a view to their place in the

overall statutory scheme." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551

U.S. 644, 666 (2007). Where a statutory term is undefined, courts give it its

ordinary meaning. *United States v. Wright*, 774 F.3d 1085, 1088 (6th Cir. 2014).

The Sixth Circuit recently defined "solicit" as "to make petition to . . . especially:

to approach with a request or plea (as in selling or begging)." *Platt*, 894 F.3d at

250 (quoting *O'Toole v. O'Connor*, 2016 WL 4394135, at *16 (S.D. Ohio Aug. 18,

2016) (quoting Webster's Third New International Dictionary, Unabridged (2016)).

At bottom, the aim of the statute is to preclude certain third-party collection of signed absentee ballot applications. The state does not want anyone outside of the enumerated persons of trust to possess, collect, or return any signed absentee ballot applications. To protect this interest, the Legislature banned such persons from soliciting or requesting to return such applications, thus reducing the danger of anyone outside the enumerated persons of trust from possessing, collecting, or returning any signed absentee ballot applications. The affidavits submitted by plaintiffs suggest that they do understand what is prohibited by § 759. For example, in Guy Cecil's affidavit, he says that but for the Absentee Ballot Law, Priorities USA would support partner organizations to organize around absentee ballot voting, including "offering assistance to voters in submitting an absentee ballot application, and assisting voters in submitting absentee ballot applications." (ECF No. 22-4, ¶ 12). Mr. Cecil acknowledges that they cannot do so because the Absentee Ballot Law criminalizes these activities. *Id*. Similarly, Maxwell Lubin from Rise, but for the Absentee Ballot Law, would also deploy volunteers to assist and offer to assist voters in submitting absentee ballot applications. (ECF No. 22-6, ¶ 26). In the court's view, the prohibited conduct or speech is readily understood by a person of ordinary intelligence. That is, a person must not solicit

or request to do that which would place signed absentee ballot applications in his or her possession for collection or return.  Accordingly, the court concludes that plaintiffs are unlikely to succeed on the merits of their claim that the Absentee Ballot Law is unduly vague in violation of the Fourteenth Amendment.

### c.     Preemption by the Voting Rights Act

Plaintiffs maintain that the § 759 of the Absentee Ballot Law is preempted by § 208 of the Voting Rights Act.  Section 208 provides:

> Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.

52 U.S.C. § 10508.  The VRA defines the terms "vote" and "voting" to include:

> [A]ll action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.

52 U.S.C. § 10310.  The definition of "voting" appears to include all stages of applying for an absentee ballot.  *OCA-Greater Houston v. Texas*, 867 F.3d 604, 615 (5th Cir. 2017) (Interpreting the VRA and stating that "'[t]o vote,' therefore, plainly contemplates more than the mechanical act of filling out the ballot sheet.  It includes steps in the voting process before entering the ballot box, 'registration,'

and it includes steps in the voting process after leaving the ballot box, 'having such ballot counted properly.' Indeed, the definition lists 'casting a ballot' as only one example in a non-exhaustive list of actions that qualify as voting.").

The doctrine of preemption is rooted in the Supremacy Clause of the United States Constitution, U.S. Const., Art. VI, ¶ 2, and is based on the premise that when state law conflicts or interferes with federal law, state law must give way. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 662-64 (1993); *Cipollone v. Liggett Group, Inc*., 505 U.S. 504, 515-16 (1992).  Federalism concerns counsel that state law should not be found preempted unless that is "the clear and manifest purpose of Congress."  *Rice v. Santa Fe Elevator Corp*., 331 U.S. 218, 230 (1947). However, "clear and manifest" does not necessarily mean "express," and "Congress's intent to preempt can be implied from the structure and purpose of a statute even if it is not unambiguously stated in the text."  *Teper v. Miller*, 82 F.3d 989, 993 (11th Cir. 1996) (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 523-25 (1977)).  As explained in *Teper*, the Supreme Court has identified three categories of preemption: (1) "express," where Congress "define[s] explicitly the extent to which its enactments pre-empt state law," *English v. General Elec. Co.,* 496 U.S. 72, 79 (1990); (2) "field," in which Congress regulates a field so pervasively, or federal law touches on a field implicating such a dominant federal interest, that an intent for federal law to occupy the field exclusively may be inferred; and (3)

"conflict," where state and federal law actually conflict, so that it is impossible for a party simultaneously to comply with both, or state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  Preemption of any type "fundamentally is a question of congressional intent."  *Id*.

Plaintiffs point out that in its report recommending that this protection be added to the Voting Rights Act, the Senate Judiciary Committee noted that state restrictions that "deny the assistance at some stages of the voting process during which assistance was needed" would violate § 208.  S. Rep. No. 97-417, at 63 (1982).  In recommending that § 208 be added to the Voting Rights Act, the Senate Judiciary Committee recognized that voters who do not speak English and voters with disabilities "run the risk that they will be discriminated against at the polls and that their right to vote in State and Federal elections will not be protected."  S. Rep. No. 97-417, at 62 (1982).  To limit that risk, those voters "must be permitted to have the assistance of a person of their own choice."  *Id*.

Plaintiffs contend that § 208 preempts Michigan's Absentee Ballot Law because Michigan's law prohibits voters who need help returning their absentee ballot applications from receiving assistance from the person of their choice. Instead, a voter is limited to choosing amongst only registered Michigan voters, family members, or household members, and not any of the hundreds of thousands

of other Michigan residents who may be none of these things. Further, an absentee voter may not receive assistance with their application from a third party if that third party has offered to help. *See OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) (Section 208 preempted a Texas law restricting who may provide interpretation assistance to English-limited voters); *United States v. Berks Cty., Pennsylvania*, 277 F.Supp.2d 570, 580 (E.D. Pa. 2003) (county election law restricting who may provide language assistance to Spanish-speaking voters violated § 208).

The Legislature argues that because Michigan's prohibition on the unauthorized solicitation and collection of absentee ballots does not "stand[] as an obstacle to the accomplishment and execution" of Congress's objectives, there is no preemption. *Gade v. Nat'l Solid Wastes Mgmt Ass'n*, 505 U.S. 88, 98 (1992) (Conflict preemption occurs where compliance with both a federal and state regulation is physically impossible or "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."). According to the Legislature, nothing in § 208 prevents the state from reasonably restricting the individuals permitted to return absentee ballot applications. Defendant and the Republican Party make similar arguments.

When federal preemption is alleged, the analysis starts with "the assumption that the historic police powers of the States were not to be superseded by the

35

Federal Act unless that was the clear and manifest purpose of Congress." *Cmty. Refugee & Immigration Servs. v. Registrar, Ohio Bureau of Motor Vehicles*, 334 F.R.D. 493, 509 (S.D. Ohio 2020) (quoting *City of Columbus v. Ours Garage and Wrecker Service, Inc*., 536 U.S. 424, 438 (2002) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). While there is a strong presumption against preemption of a state law by a federal regulation, *Rice v. Santa Fe Elevator Corp*., 331 U.S. 218, 230 (1947), Congress may preempt a state law by enacting its own specific laws. *Cmty. Refugee & Immigration Serv.*, 334 F.R.D. at 509 (citing *Arizona v. U.S*., 567 U.S. 387, 399 (2012); *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000)). When interpreting a statute, the starting point is the language of the statute itself. *Wilson v. Safelite Grp., Inc*., 930 F.3d 429, 433-34 (6th Cir. 2019) (citing *Hale v. Johnson*, 845 F.3d 224, 227 (6th Cir. 2016)). "Where the statute's language is clear and unambiguous and the statutory framework is coherent and consistent, 'the sole function of the courts is to enforce it according to its terms.'" *Id*. (quoting *United States v. Ron Pair Enters., Inc*., 489 U.S. 235, 241 (1989)). But "we must take care not to interpret the language [of a statute] in a vacuum; instead, we must look to the 'structure, history, and purpose' of the statutory scheme." *Id*. (quoting *Abramski v. United States*, 573 U.S. 169, 179 (2014)).

Section 208 provides that certain specified voters – i.e. those needing assistance due to blindness, disability, or inability to read or write – "may be given assistance by *a* person of the voter's choice…"  (Emphasis added).  Section 208 does not say that a voter is entitled to assistance from *the* person of his or her choice or *any* person of his or her choice.  In other words, the statute employs the indefinite article "a" which by its very term is non-specific and non-limiting, as opposed to the definite article "the," which by its terms is specific and limiting. *See* "Indefinite article," Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/indefinite%20article. Accessed 9/17/2020; "Definite article," Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/definite%20article. Accessed 9/17/2020. (Defining an indefinite article as "[t]he word a or an used in English to refer to a person…not identified or specified," and defining definite article as "the word the used in English to refer to a person or thing that is identified or specified.").  Congress's language choice must be given meaning and here, where it has declined to use a definite article, its language suggests that some state law limitations on the identity of persons who may assist voters is permissible.

This conclusion is also supported by the legislative history.  In passing § 208, Congress explained that it would preempt state election laws "only to the extent that they unduly burden the right recognized in [Section 208], with that

determination being a practical one dependent upon the facts." S. REP. NO. 97-417, at 63 (1982); *see also Ray v. Texas*, 2008 WL 3457021 (E.D. Tex. Aug. 7, 2008) ("The legislative history [of § 208] evidences an intent to allow the voter to choose *a* person whom the voter trusts to provide assistance. It does not preclude all efforts by the State to regulate elections by limiting the available choices to certain individuals.") (emphasis in original). Notably, plaintiffs have not come forward with evidence that any voters have been denied the person of their choice to assist them in the absentee ballot application process, let alone voters belonging to the class of individuals identified in § 208 (i.e. those requiring assistance due to blindness, disability, or inability to read or write). Thus, they have not made a showing of undue burden. Rather, plaintiffs' evidence speaks in generalities about low income voters, elderly voters, student voters, disabled voters, and voters for whom English is their second language. (ECF 22-4, Affidavit of G. Cecil, "I am concerned that the … Absentee Ballot Organizing Ban will depress the vote among persons [Priorities USA] is targeting for engagement in the political process in Michigan, including low income and student voters and voters who are disabled."); ECF No. 22-5, Affidavit of A. Hunter, "APRI Detroit/Downriver plans to (a) educate individuals throughout our community about their ability to apply to vote via absentee ballot in upcoming elections and (b) provide assistance with those applications. For example, there are large Spanish- and Arabic-speaking

populations in our community, and we have members who speak those languages. APRI Detroit/Downriver plans to go into those communities and educate individuals about the absentee ballot application process in their own language, as well as offer assistance with filling out and returning the absentee ballot applications."); (ECF No. 22-6, Affidavit of M. Lubin, "In my experience, get-out-the-vote activities such as … absentee ballot organizing are critically important organizing tools for our student organizers and volunteers.").  Though plaintiffs' evidence ably demonstrates that they plan to target at least two categories of voters covered by § 208, disabled voters and voters who may face language barriers, they offer no examples of instances in which such voters have been deprived of voting assistance.  The omission is notable in that for other cases challenging limits on who may assist with ballots, the challengers provided evidence of individual voters who were denied necessary assistance in the voting process.  For example, in *OCA-Greater Houston v. Texas*, one of the plaintiffs was an English-limited voter who had been unable to complete her ballot due to the challenged state law limiting those eligible to assist as an interpreter.  867 F.3d at 615.  And, in *United States v. Berks Cnty.*, 250 F.Supp.2d 525, 530 (E.D. Pa. 2003), the government presented specific evidence of English-limited voters denied the right to use a voting assistant of choice by poll workers.  Given the lack of evidence that any voters have been affected by the limits on their choice of assistance, there is no basis for

the court to conclude that Michigan's law stands as an obstacle to the objects of § 208.  Accordingly, the court finds that plaintiffs have not shown a likelihood of success on their bid to overcome the presumption against preemption.

### 2.     *Voter Transportation Law*

Plaintiffs also contend that the Voter Transportation law is preempted by federal law.  More particularly, they argue that the Voter Transportation Law imposes a spending limit of $0 as it relates to elections involving federal candidates and as such, the law conflicts with federal regulations expressly permitting corporations to spend money to transport voters to polls.  11 C.F.R. § 114.3(c)(4)(i); 11 C.F.R. § 114.4(d)(1).  Accordingly, plaintiffs argue that the Voter Transportation Law is both expressly and impliedly preempted by the Federal Election Campaign Act (FECA) and its regulations.

The Legislature contends that the Voter Transportation Law does not limit contributions or expenditures with respect to federal elections and that plaintiffs' argument ignores FECA's carve out for state statutes that protect against voting related fraud and other abuses.  According to the Legislature, because the Voter Transportation Law protects against quid pro quo and voter fraud, it falls within the carve out set forth in 11 C.F.R. § 108.7.  The Republican Party further asserts that the FECA preemption provisions have been narrowly construed by the courts and that plaintiffs do not point to any cases providing that FECA preempts state

criminal laws targeting election fraud.  The Republican Party also argues that FECA regulations do not conflict with the Voter Transportation Law because the regulations allow corporation to "provide" transportation whereas the Transportation Law expressly prohibits *payment* for transportation.  Accordingly, says the Republican Party, nothing in the Voter Transportation Law prohibits plaintiffs from *providing* transportation.

As *Teper* explained, in order to decide the preemptive effect of FECA on a state law, the court must "juxtapose the state and federal laws, demonstrate their respective scopes, and evaluate the extent to which they are in tension." Michigan's Voter Transportation Law provides in full:

> A person shall not hire a motor vehicle or other conveyance or cause the same to be done, for conveying voters, other than voters physically unable to walk, to an election.

Mich. Comp. Laws § 168.931(1)(f).  While there is no Michigan case interpreting the Voter Transportation Law in this context, as discussed above, a universal rule of statutory construction is that "the courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992).  "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Id*. (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)).

The Michigan Election Law does not define "person."  But Mich. Comp. Laws § 8.3l provides that "[t]he word 'person' may extend and be applied to bodies politic and corporate, as well as to individuals."  *See also* Mich. Comp. Laws § 8.3a ("All words and phrases shall be construed and understood according to the common and approved usage of the language[.]").  Similarly, the act does not define the term "hire."  Albeit in an unpublished decision, the Michigan Court of Appeals has interpreted the term in another context to mean "'to engage the services of for wages or other payment,' or 'to engage the temporary use of at a set price.'"  *Tech & Crystal, Inc v. Volkswagen of Am, Inc*., 2008 WL 2357643, at *3 (Mich. Ct. App., June 10, 2008) (quoting Random House Webster's College Dictionary (1997)).  The Act defines "[e]lection" to mean "an election or primary election at which the electors of this state or of a subdivision of this state choose or nominate by ballot an individual for public office or decide a ballot question lawfully submitted to them."  Mich. Comp. Laws § 168.2(g).  The court finds the Voter Transportation Law to be relatively straightforward and unambiguous.  In a nutshell, no person (including a corporation) may pay wages or make any other payment to another to transport voters to the polls, unless the person so transported cannot walk.  Thus, under Michigan's law, a corporation is limited to providing transportation for voters who can walk through means that do not involve payment

to the person doing the transporting.  Now, the court must examine the scope and meaning of the relevant FECA provisions and accompanying regulations.

FECA was amended in 1974 to include a preemption provision, which states that "[t]he provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provisions of state law with respect to election to Federal office." *Teper*, 82 F.3d at 994 (quoting 2 U.S.C. § 453).  The current version § 453 replaced a prior provision that included a savings clause, expressly preserving state laws, except where compliance with state law would result in a violation of FECA or would prohibit conduct permitted by FECA.  *Id*. (citing Federal Election Campaign Act of 1971, Pub.L. No. 92-225, 1972 U.S.C.C.A.N. (86 Stat.) 23 (amended by Federal Election Campaign Act Amendments of 1974, Pub.L. No. 93-443, 1974 U.S.C.C.A.N. (88 Stat.) 1469)).  The House Committee that drafted the current provision intended "to make certain that the Federal law is construed to occupy the field with respect to elections to Federal office and that the Federal law will be the sole authority under which such elections will be regulated." *Id*. (quoting H.R. Rep. No. 1239, 93d Cong., 2d Sess. 10 (1974)).  "When Congress ... has included in the enacted legislation a provision explicitly addressing [preemption], and when that provision provides a 'reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions' of the

legislation." *Cipollone*, 505 U.S. at 517, 112 S.Ct. at 2618 (citations omitted).

The interpretive regulation, 11 C.F.R. § 108.7, sets forth the statute's preemptive

scope in accordance with the statute's plain language and its legislative history:

> (a) The provisions of the Federal Election Campaign Act
> of 1971, as amended, and rules and regulations issued
> thereunder, supersede and preempt any provision of State
> law with respect to election to Federal office.
>
> (b) Federal law supersedes State law concerning the—
>
>> (1) Organization and registration of political
>> committees supporting Federal candidates;
>> (2) Disclosure of receipts and expenditures by
>> Federal candidates and political committees; and
>> (3) Limitation on contributions and expenditures
>> regarding Federal candidates and political
>> committees.
>
> (c) The Act does not supersede State laws which provide
> for the—
>
>> (1) Manner of qualifying as a candidate or political
>> party organization;
>> (2) Dates and places of elections;
>> (3) Voter registration;
>> (4) Prohibition of false registration, voting fraud,
>> theft of ballots, and similar offenses; or
>> (5) Candidate's personal financial disclosure.

*See Bunning v. Com. Of Ky.*, 42 F.3d 1009, 1012 (6th Cir. 1994).

According to 11 C.F.R. § 114.4(c)(2), a corporation may make voter

registration and get-out-the-vote communications to the general public.

Disbursements for such activities are not considered contributions or expenditures

if the voter registration and get-out-the-vote communications to the general public

do not expressly advocate the election or defeat of any clearly identified candidate

or candidates of a clearly identified political party and the preparation of voter

registration and get-out-the-vote communications are not coordinated with any

candidate or political party. *Id*. Further, a corporation may support or conduct

voter registration and get-out-the-vote drives aimed at employees outside its

restricted class and the general public. 11 C.F.R. § 114.4(d)(1). Disbursements for

such voter registration and get-out-the-vote efforts are *not expenditures*,[4] if the

corporation does not make any communication expressly advocating the election

or defeat of any clearly identified candidate or party as part of the voter registration

or get-out-the-vote drive, the drive is not directed primarily to individuals

registered with or who intend to register with the party favored by the corporation,

the information and other assistance with registration, including transportation, are

made available without regard to the voter's political preference, the individuals

conducting the drives are not paid on the basis of the number of individuals

registered or transported who support a particular candidate or party, and the

---

[4] "The terms contribution and expenditure shall include any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a State bank, a federally chartered depository institution (including a national bank) or a depository institution whose deposits and accounts are insured by the Federal Deposit Insurance Corporation or the National Credit Union Administration, if such loan is made in accordance with 11 CFR 100.82(a) through (d)) to any candidate, political party or committee, organization, or any other person in connection with any election to any of the offices referred to in 11 CFR 114.2 (a) or (b) as applicable." 11 C.F.R. § 114.1(a)(1).

corporation must notify those receiving information or assistance of the requirement that services cannot be denied on the basis of party or candidate preference.  11 C.F.R. § 114.4(d)(2)(i)-(v).

Accordingly, organizations like plaintiffs could offer two types of voter registration and get-out-the-vote drives.  First it could offer the type described in § 114.4(c)-(d), which, if followed, would not be considered an "expenditure" for purpose of FECA.  Or presumably, it could offer drives that are partisan and do advocate for certain candidates or political parties, in which case, the expenses associated with the drive would be classified as "independent expenditures" under FECA, thus triggering the federally mandated disclaimers identifying the organization paying for the communication and stating that the communication was not authorized by a candidate or candidates' committee.  *See* 11 C.F.R. §§ 109.11, 110.11.  In either case, the FECA regulations expressly permit corporations like plaintiffs to spend money on providing transportation to the polls as part of their get-out-the-vote efforts.  And to the extent that providing such transportation is tied to a specific candidate or party, Congress has elected to preempt state laws limiting such contributions and expenditures.  11 C.F.R. § 108.7(b)(3).  This allowance thus conflicts with Michigan's Voter Transportation Law, which bars *all* spending on transportation to the polls, except for that made on behalf of those unable to walk to the polls.  *See Teper*, 82 F.3d at 995 ("[I]t is

the effect of the state law that matters in determining preemption, not its intent or purpose.  Under the Supremacy Clause, state law that in effect substantially impedes or frustrates federal regulation, or trespasses on a field occupied by federal law, must yield, no matter how admirable or unrelated the purpose of that law.").

The question now becomes whether the Voter Transportation Law falls within one of the areas excepted from preemption; 11 C.F.R. § 108.7(c)(4) excepts from preemption state laws that prohibit false registration, voting fraud, theft of ballots, and similar offenses.   In order to wedge the Voter Transportation Law into this category as defendant and intervenors suggest, the court must read language into the statute which is no longer there.  As the parties explain, in its previous form, the Voter Transportation Law expressly prohibited paying for transportation to the polls as a quid pro quo for a vote.  As originally enacted, the Voter Transportation Law, 1895 P.A. 135, stated:

> Any person who shall hire any carriage or other conveyance, or cause the same to be done, for conveying voters, other than voters physically unable to walk thereto, to any primary conducted hereunder, or who shall solicit any person to cast an unlawful vote at any primary, or who shall offer to any voter any money or reward of any kind, or shall treat any voter or furnish any entertainment for the purpose of securing such voter's vote, support, or attendance at such primary or convention, or shall cause the same to be done, shall be deemed guilty of a misdemeanor.

Yet, the Legislature later expressly removed all language relating to paying for transportation in exchange for a vote.  Nothing in the plain language of the Transportation Law, as it is now written, suggests that its purpose is to prevent voter fraud or similar offenses.  While the Voter Transportation Law is contained within a broader provision addressing prohibited conduct in Michigan's Election Law, not all prohibited conduct found in this section is designed to prevent voter fraud and the influencing of votes.  For example, § 168.931(1)(g) imposes a penalty on an inspector of election for failing to report to the designated polling place.  *See also*, § 168.931(1)(h) ("A person shall not willfully fail to perform a duty imposed upon that person by this act, or disobey a lawful instruction or order of the secretary of state as chief state election officer or of a board of county election commissioners, board of city election commissioners, or board of inspectors of election.").  In contrast, other subsections speak in specific terms about prohibiting vote-buying and vote-influencing.  *See e.g.*, § 168.931(1)(d) ("A person shall not, either directly or indirectly, discharge or threaten to discharge an employee of the person for the purpose of influencing the employee's vote at an election."); § 168.931(1)(e) ("(e) A priest, pastor, curate, or other officer of a religious society shall not for the purpose of influencing a voter at an election, impose or threaten to impose upon the voter a penalty of excommunication, dismissal, or expulsion, or command or advise the voter, under pain of religious

48

disapproval.").  The Voter Transportation Law, like other subsections found in § 168.931, does not directly speak to voter fraud or vote-influencing.  While defendant and the Intervenors want the court to read an anti-fraud purpose into Voter Transportation Law's ban on hiring or paying for transportation, it is unclear how paying for a taxi or Uber is any more likely to influence a voter than offering to transport them by way of a volunteer driver in a non-profit corporation's minivan.  Moreover, FECA expressly allows expenditures, including those for transportation, to be made in relation to a particular candidate.  So, premising a purpose of fraud prevention on the idea that spending on rides for particular candidates or parties leads to fraud is inconsistent with federal law.  Thus, the court finds the Voter Transportation Law unlikely to fall into this exception to preemption.

As set forth above, the Intervenors also argue that FECA's preemptive scope is to be narrowly construed and that state criminal statutes are generally not preempted by FECA.  The court's reading of the cases addressing FECA's preemptive scope suggest a different line of demarcation:  those cases involving statutes of general application versus those cases involving statutes directly bearing on elections and campaign finance.  The court in *Janvey v. Democratic Senatorial Campaign Committee, Inc*., 712 F.3d 185 (5th Cir. 2013) focused on this distinction.  In *Janvey*, the court examined whether the Texas Uniform Fraudulent

Transfer Act (TUFTA) was preempted by FECA.  In *Janvey*, the receiver of assets of the perpetrators of a Ponzi scheme sought to recover the perpetrators' contributions that had been made to various political committees under TUFTA. The political committees contended that TUFTA was preempted by FECA.  The court concluded that TUFTA was a general state statute that "happens to apply to federal political committees in the instant case."  *Id*. at 200.  *See also Stern v. Gen. Electric Co*., 924 F.2d 472 (2d Cir. 1991) (holding that § 453 does not preempt a state law establishing a company's directors' fiduciary duty to shareholders, including not wasting corporate assets, and explaining that "the narrow wording of [§ 453] suggests that Congress did not intend to preempt state regulation with respect to non-election-related activities"); *Reeder v. Kans. City Bd. of Police Comm'rs*, 733 F.2d 543 (8th Cir. 1984) (holding that § 453 did not preempt a state law prohibiting officers or employees of the Kansas City Police Department from making any political contribution); *Friends of Phil Gramm v. Ams. for Phil Gramm in '84*, 587 F.Supp. 769 (E.D. Va. 1984) (holding that § 453 did not preempt a state law prohibiting unauthorized use of a person's name for advertising or commercial purposes).  These cases stand in contrast to those finding preemption of state law that regulated elections or campaign finance.  *See Teper v. Miller*, 82 F.3d 989 (11th Cir. 1996) (state law effectively prohibiting Georgia legislators from accepting donations for a federal campaign while the state General Assembly was

in session); *Bunning v. Ky.*, 42 F.3d 1008 (6th Cir. 1994) (state law authorizing investigation of campaign expenditures of a federal political committee); *Weber v. Heaney*, 995 F.2d 872 (8th Cir. 1993) (state law establishing system under which federal congressional candidates could agree to limit their federal expenditures in exchange for state funding for their campaigns).  In the court's view, the Voter Transportation Law, which is contained in a chapter of the Michigan Election Law, directly regulates election activity and campaign-related spending.  Accordingly, it falls in the latter category of cases where preemption by FECA is generally found.

      C.    <u>Irreparable Harm and the Balance of Harms</u>

To establish irreparable harm, plaintiffs must show that, unless their motion is granted, they will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated.  *Abney v. Amgen*, *Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).  The court's role on a preliminary injunction motion is to assess not whether a particular outcome or harm is possible or certain, but whether "irreparable injury is likely in the absence of an injunction."  *Winter v. NRDC*, *Inc.,* 555 U.S. 7, 22 (2008).  "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  A preliminary injunction will not be issued simply to prevent the

possibility of some remote future injury. *Los Angeles v. Lyons*, 461 U.S. 95 (1983). Irreparable injury is presumed "when constitutional rights are threatened or impaired." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). In particular, a "restriction on the fundamental right to vote," *id.*, or the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Here, because the court has concluded that plaintiffs are unlikely to succeed on their constitutional claims as they relate to the Absentee Ballot Law, no constitutional rights are threatened or impaired by this law. Thus, irreparable harm is unlikely. The Intervenors argue that plaintiffs cannot show irreparable harm in "educat[ing] voters about their options to vote absentee" or "encourage[ing] voters to take advantage of the conveniences of absentee voting" (ECF No. 22-1, PageID.164), when the Secretary of State plans to send every registered voter an AV ballot application in Michigan before the primary and general elections. (ECF 70-4, Ex. 3). Equally important, nothing in the Absentee Ballot Law precludes plaintiffs from engaging in such education efforts. Rather, the law only precludes them from requesting or soliciting to return signed absentee voter applications. Accordingly, the court finds that irreparable harm to plaintiffs by not issuing the preliminary injunction as to the Absentee Ballot Law is unlikely.

Conversely, issuing a preliminary injunction as to the Absentee Ballot Law would cause harm to the State. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J. in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J. in chambers). Moreover, the State's public interest in preserving the integrity of its election processes cannot seriously be disputed. *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989); *Crawford*, 553 U.S. at 194-97. Accordingly, the court finds that the balance of harms and the public interest weigh against issuing a preliminary injunction on the Absentee Ballot Law.

In contrast, the court has concluded that plaintiffs are likely to succeed on the merits of their claim that the Voter Transportation Law is preempted by FECA. Denying a preliminary injunction would impair plaintiffs' ability to transport voters to the polls and to spend money to do so, which is contrary to federal election law and frustrates the purpose of FECA. Congress implemented a statutory scheme and gave citizens the right to spend money on transporting voters to the polls. The November election is nearly upon us and any particular election only occurs once. The restriction on plaintiffs' ability to organize and spend money on transporting voters to the polls for this election cannot be remedied

without injunctive relief.  Issuing a preliminary injunction to permit plaintiffs to organize and spend money on transporting voters to the polls also serves the public interest.  As the Sixth Circuit has noted, "[t]here is a strong public interest in allowing every registered voter to vote freely."  *Summit Cty. Democratic Cent. & Exec. Comm. v. Blackwell*, 388 F.3d 547, 551 (6th Cir. 2004).  Any harm to the state in finding the Voter Transportation Law preempted is outweighed by the harm to plaintiffs and the public.  On balance, a weighing of the factors favors injunctive relief. [5]

## V.   CONCLUSION

For the reasons set forth above, plaintiffs' motion for preliminary injunction as to the Absentee Ballot Law is **DENIED** and their motion for preliminary injunction as to the Voter Transportation Law is **GRANTED**.

**IT IS SO ORDERED**.

Date: September 17, 2020                    s/Stephanie Dawkins Davis
                                            Stephanie Dawkins Davis
                                            United States District Judge

---

[5] In light of the court's finding that injunctive relief is appropriate based on preemption, the court deems it unnecessary and contrary to the exercise of judicial economy to address plaintiff's additional challenges to the statute at this juncture.