UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PRIORITIES USA, et al.,

                    Plaintiffs,

v.

DANA NESSEL,

                    Defendant.

_____/

Case No. 2:19-cv-13341

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER**
**GRANTING MOTIONS FOR JUDGMENT ON THE PLEADINGS [113; 115]**

Plaintiffs have challenged Michigan's laws on voter transportation and absentee ballot organizing. ECF 1. The case was originally assigned to Judge Mark A. Goldsmith until it was reassigned to Judge Stephanie Dawkins Davis in January 2020. *See* 20-AO-010. In two-and-one-half years' time, Judge Dawkins Davis made several significant rulings in the case before she was elevated to a judgeship on the United States Court of Appeals for the Sixth Circuit. During her tenure presiding on the case, the Court granted in part and denied in part Attorney General Dana Nessel's motion to dismiss. ECF 59; *Priorities USA v. Nessel*, 462 F. Supp. 3d 794, 799 (E.D. Mich. 2020).

Prior to Judge Dawkins Davis' elevation, the Court also granted motions to intervene that were made by the Michigan Senate and House of Representatives, and

1

the Michigan Republican Party and the Republican National Committee. ECF 60.[1]
Shortly before the 2020 general election, the Court preliminarily enjoined the voter-
transportation law, Mich. Comp. Laws § 168.931(1)(f), but not the absentee-ballot
law, Mich. Comp. Laws § 168.759(4), (5), (8). *Priorities USA v. Nessel*, 487 F. Supp.
3d 599, 604 (E.D. Mich. 2020).

The Sixth Circuit promptly stayed the preliminary injunction pending appeal.
*Priorities USA v. Nessel*, 978 F.3d 976, 979 (2020). The Sixth Circuit then reversed
the preliminary injunction "[f]or largely the same reasons as in [its] earlier order."
*Priorities USA v. Nessel*, 860 F. App'x 419, 420 (2021).

A few months later, the Legislative Intervenors and the Republican
Intervenors moved for judgments on the pleadings. ECF 113; 115.[2] The motions have
been unresolved for almost a year. During that time, the parties moved to exclude
testimony from certain experts under Federal Rule of Evidence 702. ECF 148; 153;
155. The parties also cross-moved for summary judgment. ECF 149; 150; 152; 154.
And Uber Technologies moved for leave to file an amicus brief in support of Plaintiffs'
summary judgment motion. ECF 157. Those motions have been pending for six
months.

Three months ago, after Judge Dawkins Davis was confirmed, the case was
reassigned, *see* 22-AO-036, and two district judges recused themselves. ECF 186; 187.

---

[1] The Court will refer to the Michigan Senate and House of Representatives as the
"Legislative Intervenors." The Court will refer to the Michigan Republican Party and
the Republican National Committee as the "Republican Intervenors."
[2] Attorney General Nessel joined the Legislative Intervenors' motion. ECF 114.

The case was then assigned here. For the following reasons, the Court will grant the pending motions for judgment on the pleadings. ECF 113;[3] 115.

## BACKGROUND

In the interest of judicial economy, the Court will adopt the background sections from Judge Dawkins Davis' earlier orders. *Priorities USA*, 487 F. Supp. 3d at 603–08; *Priorities USA*, 462 F. Supp. 3d at 799–802. The Court will also incorporate the factual and procedural background detailed in the parties' helpful joint status report. ECF 188, PgID 6842–48. The Court will add the following background.

Only claims two, four, five, and six in the amended complaint remain. ECF 188, PgID 6844 (citing ECF 109, PgID 1852–53).[4] Claims two and four challenge the absentee-ballot law.[5] ECF 17, PgID 114–16, 118–21. Claim two is a speech and associational rights challenge under the First and Fourteenth Amendments, *id.*

---

[3] Based on the parties' briefing, the Court will resolve the motions on the briefs without a hearing. *See* Fed. R. Civ. P. 78(b); E.D. Mich. L.R. 7.1(f)(2).

[4] Plaintiffs have abandoned their other claims, and the Court will grant a judgment on the pleadings as to them.

[5] The absentee-ballot law states:

> A person shall not be in possession of a signed absent voter ballot application except for the applicant; a member of the applicant's immediate family; a person residing in the applicant's household; a person whose job normally includes the handling of mail, but only during the course of his or her employment; a registered elector requested by the applicant to return the application; or a clerk, assistant of the clerk, or other authorized election official. A registered elector who is requested by the applicant to return his or her absent voter ballot application shall sign the certificate on the absent voter ballot application.

Mich. Comp. Laws § 168.759(4).

at 114–16, and claim four is a preemption challenge based on Section 208 of the Voting Rights Act ("VRA"), *id.* at 118–21. Claims five and six challenge the voter-transportation law.[6] *Id.* at 121–24. Claim five is a vagueness and overbreadth challenge, *id.* at 121–22, and claim six is a speech and associational rights challenge under the First and Fourteenth Amendments, *id.* at 122–24.

The Court previously denied Attorney General Nessel's motion to dismiss four challenges. *Priorities USA*, 462 F. Supp. 3d at 815–16 (absentee-ballot law), 818–19 (voter-transportation law). When the preliminary injunction order went up on appeal, the Sixth Circuit held that Plaintiffs were unlikely to prevail in a now-abandoned challenge to the voter-transportation law. *Priorities USA*, 978 F.3d at 982–85. The Sixth Circuit later held that "[a]lthough [the panel] did not specifically discuss [Plaintiffs'] First Amendment argument . . ., [the panel] did not—and still [does] not—find it likely to succeed." *Priorities USA*, 860 F. App'x at 422 n.3. As the Sixth Circuit put it, "First Amendment challenges to state election regulations" are "generally evaluate[d]" "using the *Anderson-Burdick* framework." *Id.* (internal quotations omitted) (quoting *Schmitt v. LaRose*, 933 F.3d 628, 639 (6th Cir. 2019)). And under that framework, the Sixth Circuit confirmed that Plaintiffs "do not seem likely to shoulder th[e] heavy burden" to show that the voter-transportation law is "a severe burden on their rights." *Id.*

---

[6] The voter-transportation law states, "A person shall not hire a motor vehicle or other conveyance or cause the same to be done, for conveying voters, other than voters physically unable to walk, to an election." Mich. Comp. Laws § 168.931(1)(f).

When the previously assigned judge granted the motions to intervene, the Court ordered that any Intervenor dispositive motion response to the amended complaint was "limited to issues not already addressed and resolved through the Court's opinion and order regarding Nessel's motion to dismiss." ECF 60, PgID 1026–27. The Court repeated the command after the Sixth Circuit's second opinion. ECF 110, PgID 1874 ("As explained in the Order Granting the Motions to Intervene, such dispositive motions must be limited to issues not already addressed and resolved through the Court's opinion regarding [] Nessel's motion to dismiss.") (citing ECF 60, PgID 1026–27).

## LEGAL STANDARD

The Court reviews a Rule 12(c) motion for judgment on the pleadings with the same standard it would employ for a Rule 12(b)(6) motion to dismiss. *Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 549–50 (6th Cir. 2008) (citation omitted). The Court accepts as true all well-pleaded material allegations of the pleadings and draws reasonable factual inferences in favor of the non-moving party, but "need not accept as true legal conclusions or unwarranted factual inferences." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581–82 (6th Cir. 2007) (quoting *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999)). The complaint must "raise a right to relief above the speculative level, and [] state a claim to relief that is plausible on its face." *Hensley Mfg., Inc. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). It is not enough to offer mere "'labels and conclusions' or 'a formulaic recitation of the elements of a

cause of action.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

Plaintiffs who assert "a broad attack on the constitutionality of election laws" and "seek relief that would invalidate the statute in all its applications bear a heavy burden of persuasion." *Priorities USA*, 860 F. App'x at 422 n.3 (cleaned up); *see also Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 338 (6th Cir. 2016) (quoting *Schrader v. Blackwell*, 241 F.3d 783, 790–91 (6th Cir. 2001)).

## DISCUSSION

The Court will first clarify why Intervenors and Attorney General Nessel properly asserted arguments in the Rule 12(c) motion despite the previously assigned judge's orders that limited the arguments they can raise in dispositive motions. After, the Court will grant the Rule 12(c) motions.[7]

I.    The Court's Earlier Orders

Plaintiffs first asserted that the Court should deny the Rule 12(c) motions because Intervenors cannot "relitigat[e] issues already decided in [the] decision denying the Attorney General's motion to dismiss." ECF 121, PgID 1966. Doing so would be "in direct contravention of this Court's prior orders." *Id.* at 1968. The Court disagrees for five reasons.

---

[7] The Republican Intervenors moved for a judgment on the pleadings largely based on the same reasons as the Legislative Intervenors and Attorney General Nessel. *Compare* ECF 113 (Legislative Intervenors and Attorney General Nessel's motion), *with* ECF 115 (Republican Intervenors' motion). For simplicity, the Court will refer to arguments made both in the motions of Legislative Intervenors and Attorney General Nessel unless otherwise noted.

First, the previously assigned judge's May 2020 order limited the arguments that Intervenors could assert in any *responsive* motion or pleading to the amended complaint. ECF 60, PgID 1026–27. Intervenors ultimately answered the amended complaint rather than responding with a motion, ECF 61; 62, as did Attorney General Nessel, ECF 65. At that time, the pleadings closed. *Wells Fargo Fin. Leasing, Inc. v. Griffin*, 970 F. Supp. 2d 700, 705 (W.D. Ky. 2013) (collecting cases finding that the pleadings close when all defendants file an answer). Because the pleadings closed, the order's plain text, ECF 60, PgID 1026–27, did not apply to any Rule 12(c) motion.

Two, foreclosing any Rule 12(c) motion based on the September 2021 order, ECF 110, PgID 1874, would require the Court to stretch the text of the order to apply to *all* dispositive motions. That reading would be clearly erroneous and manifestly unjust. *See Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 & n.7 (6th Cir. 2004) (explaining that the Court has "significant discretion" under Rule 54(b) to review interlocutory orders when there is "a need to correct a clear error or prevent manifest injustice"). Barring intervening parties from reasserting arguments that the Court denied at the start of the litigation would effectively sideline Intervenors from pursuing legitimate arguments under a motion for judgment on the pleadings, a summary judgment motion, at trial, or even in post-judgment motions. Based on those potentially absurd results, the case management order does not preclude Intervenors from asserting the arguments in their Rule 12(c) motions.

Three, even if the Court were to agree that the orders barred Intervenors from asserting the arguments in the Rule 12(c) motion, the orders do not prevent the Attorney General from doing so. Again, the May 2020 order applied only to responsive pleadings *from Intervenors*. ECF 60, PgID 1026–27 ("[Intervenors] must answer or otherwise respond to the amended complaint within ten (10) days of this opinion and order. To the extent that the responses come in the form of dispositive motions, the motions are limited to issues not already addressed and resolved through the Court's opinion and order regarding Nessel's motion to dismiss."). And Plaintiffs did not suggest that the September 2021 order barred Attorney General Nessel from asserting the same claims in *any* dispositive motion. *See* ECF 121. Again, a reading like the one advanced by Plaintiffs would stack the deck against Nessel. But here, Attorney General Nessel joined the Legislative Intervenors' Rule 12(c) motion. ECF 114, PgID 1915. Thus, even if Intervenors could not assert the arguments under Rule 12(c), no order would prevent the Attorney General from asserting the same arguments under Rule 12(c) based on her joinder.

Fourth, assuming even more that Intervenors and Attorney General could not assert a Rule 12(c) motion, nothing prevents the Court from revisiting the motion to dismiss order, *Priorities USA*, 462 F. Supp. 3d 794, under Rule 54(b). After all, the parties have extensively briefed the legal issues in the Rule 12(c) motions, and a Rule 12(c) motion has the same analysis as a Rule 12(b)(6) motion. *Tucker*, 539 F.3d at 549–50 (citation omitted).

Under Rule 54(b) "any order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry" of a final judgment. As explained earlier, courts have "significant discretion" to review interlocutory orders. *Rodriguez*, 89 F. App'x at 959 n.7. And courts should deviate from their prior rulings when they find "some cogent reason" to do so. *Petition of U.S. Steel Corp.*, 479 F.2d 489, 494 (6th Cir. 1973) (citation omitted). If a court deviates from a prior ruling, it "may modify[] or even rescind" it. *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991) (citing *Simmons Co. v. Grier Bros. Co.*, 258 U.S. 82, 88 (1992)). And courts do revisit an interlocutory order "when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Rodriguez*, 89 F. App'x at 959 (citation omitted). As identified below, there were several clear errors of law in the previously assigned judge's order.

Last, the law-of-the-case doctrine does not prevent the Court from addressing the merits of the Rule 12(c) motion. The doctrine "simply expresses common judicial practice; it does not limit the courts' power." *Castro v. United States*, 540 U.S. 375, 384 (2003) (internal quotations and citation omitted). To be sure, "courts are free to revisit their own rulings before final judgment." *Edmonds v. Smith*, 922 F.3d 737, 739–40 (6th Cir. 2019) (citation omitted); *see also Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) ("A court has the power to revisit prior decisions of its own or of a coordinate court in *any* circumstance.") (emphasis added)

(citation omitted). And that is precisely what the Court will do here. In all, the Rule 12(c) arguments are fair game for the Court to adjudicate at the present stage.

II.   <u>Claim Two: Speech and Associational Challenges to the Absentee-Ballot Law</u>

Intervenors and Attorney General Nessel asserted that the First Amendment challenge to the absentee-ballot law fails under the *Anderson-Burdick* framework. ECF 113, PgID 1902–07. The Court did not dismiss the challenge when it reviewed the law under exacting scrutiny. *Priorities USA*, 462 F. Supp. 3d at 812.

The Court will first explain why Plaintiffs' conduct related to the absentee-ballot law lacks First Amendment protections. The Court will then explain why, even if the protections did apply, the *Anderson-Burdick* framework would apply to the challenge—not exacting scrutiny—and why the law would satisfy the framework.

A.   *Plaintiffs' Conduct Is Not Protected*

The First Amendment not only protects spoken or written speech, but also expressive conduct. *Texas v. Johnson*, 491 U.S. 397, 404 (1989). "In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," the Supreme Court has "asked whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." *Id.* (brackets and quotation omitted). But the First Amendment does not protect conduct that is "expressive only because" it is accompanied by "speech explaining it." *Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006).

Plaintiffs claimed that the absentee-ballot law "will have chilling effects on efforts to educate voters about" the benefits of absentee voting. ECF 17, PgID 110–11. As Plaintiffs put it, the law "squelches a key component of electoral organizing by preventing [them] from assisting voters in applying for an absentee ballot. Such interactions are important and meaningful vehicles for conversations about the importance of voting, as well as the merits of candidates and ballot measures." ECF 121, PgID 1969–70 (citation omitted).

But the absentee-ballot law alters only Plaintiffs' non-expressive conduct; it leaves their speech and ability to associate with voters untouched. As a result, the law does not prevent Plaintiffs from helping voters navigate the absentee application process. Three reasons support the finding.

First, returning a completed absentee-ballot application for a voter is not inherently expressive; speech must accompany the conduct to convey a particularized message. *See FAIR*, 547 U.S. at 66. For instance, if Plaintiffs fail to explain to a voter who Plaintiffs are, what their mission is, and where they are taking the ballot application, the voter could only guess what Plaintiffs would ultimately do with their completed application. Consider too that merely taking a completed application from a voter expresses "turn out the vote" no more than it expresses "throw this away." Indeed, Plaintiffs even acknowledged that the conduct barred by the law is an "important and meaningful *vehicle*[] for conversations about the importance of voting, as well as the merits of candidates and ballot measures." ECF 121, PgID 1969–70 (emphasis added). Put another way, a conversation must accompany the conduct to

11

meaningfully further Plaintiffs' missions. It follows that the law prohibits conduct that is a mere "vehicle" for speech rather than speech itself. All told, the simple act of returning an absentee-ballot application does not "possess[] sufficient communicative elements" such that "the likelihood [is] great that the message would be understood by those who viewed it." *Johnson*, 491 U.S. at 404 (quotation omitted).

Second, Plaintiffs overinflate the reach of the absentee-ballot law. The law prohibits Plaintiffs only from being "in possession of a signed absent voter ballot application." § 168.759(4). Plaintiffs may therefore engage in a host of activities designed to "assist[] voters in applying for an absentee ballot." ECF 121, PgID 1970. Plaintiffs may have "conversations about the importance of voting, as well as the merits of candidates and ballot measures." *Id*. Plaintiffs may even "educate the public about registering to vote absentee and answer questions about this process." *Priorities USA*, 487 F. Supp. 3d at 614. And they may provide "a pool of electors that can return the [applications] for them when requested by voters." *Id*. at 614–15 (emphasis omitted). What is more, Plaintiffs may provide potential absentee voters with blank applications. ECF 115, PgID 1940; *see* § 168.759(4); *cf. Lichtenstein v. Hargett*, ---F. Supp. 3d---, 2021 WL 5826246, at *14, 32 (M.D. Tenn. 2021) ("[D]elivery of blank absentee-voting application forms is not inherently expressive conduct"). In turn, such conduct could be a "vehicle" to discuss the "importance of voting, as well as the merits of candidates and ballot measures." ECF 121, PgID 1970; *see* ECF 115, PgID 1940.

Last, the facts here are far different from the facts in *Meyer v. Grant*, 486 U.S. 414 (1998) and *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706 (M.D. Tenn. 2019) when election laws barred political speech. Admittedly, the previously assigned judge pigeonholed the absentee-ballot law's modest restrictions with the sweeping restrictions in *Meyer* and *Hargett*. *Priorities USA*, 462 F. Supp. 3d at 814 ("[I]t is difficult to distinguish the political speech at issue here from that in *Hargett* [and] *Meyer*."). But the facts here are at odds with the conclusion.

In *Meyer*, a Colorado law "ma[de] it a felony to pay petition circulators." 486 U.S. at 416. The law was a "limitation on political expression" because circulation of an initiative petition itself "involve[d] both the expression of a desire for political change and a discussion of the merits of the proposed change." *Id.* at 420–21. And the circulator would "in almost every case" need to explain "the nature of the proposal and why its advocates support it," which is "interactive communication concerning political change," or "core political speech." *Id.* at 421–22. Not so here. For one, a petition inherently advocates for a particular position, and it requires a minimum number of signatures to be effective; an absentee-voting application lacks those qualities. For another, the Colorado law restricted the number of persons who could convey the political message. *Id.* at 422–23. No such front-end restriction exists here. The absentee-ballot law allows all conduct relating to speech and association but proscribes physically returning a completed application. In the end, Plaintiffs may still explain their missions in full and educate voters about absentee voting. *See* § 168.759(4); *Priorities USA*, 487 F. Supp. 3d at 614.

And in *Hargett*, a Tennessee law stymied voter registration drive activity. 400 F. Supp. 3d at 711–13. The law required election drive coordinators to be registered voters, trained by the government, and maintain certain records for the State. *Id.* at 711–12. The law also levied a civil penalty if the plaintiffs filed incomplete registration applications, *id.*, and it required any public communication about voter registration status to include a disclaimer, *id.* at 712–13. The law thus involved "the direct regulation of communication and political association," and exacting scrutiny applied. *Id.* at 725. Michigan's absentee-ballot law is far narrower: it restricts only the possession of a completed ballot application. § 168.759(4). It neither compels nor prohibits speech. And it neither requires training nor demands maintaining records. Simply put, the laws in *Meyer* and *Hargett* regulated political speech—Michigan's absentee-ballot law does not.

At bottom, the absentee-ballot law limits only *non*-expressive conduct. First Amendment protections, therefore, do not apply to Plaintiffs' conduct.

### B.    Applicable Standard

Even if the absentee-ballot law abridged Plaintiffs' expressive conduct (but not core political speech), the Court need not apply exacting scrutiny. The Court must instead scrutinize the law under the *Anderson-Burdick* framework for two reasons. First, the Sixth Circuit has told the Court to analyze the voter-transportation law under the *Anderson-Burdick* framework. *Priorities USA*, 860 F. App'x at 422 n.3. It follows that the Court must apply that holding to the absentee-ballot law because Plaintiffs have conceded that "the same standard applies to the [C]ourt's review of

the Voter Transportation Law as the Absentee Ballot Law." *Priorities USA*, 462 F. Supp. 3d at 816.

Although the Sixth Circuit's holding appeared in a footnote, it was not dicta because it addressed an alternative ground for resolving the preliminary injunction appeal. *Priorities USA*, 860 F. App'x at 422 n.3; *see Freed v. Thomas*, 976 F.3d 729, 738 (6th Cir. 2020) ("[D]ictum is anything 'not necessary to the determination of the issue on appeal.'") (citation omitted). And the Sixth Circuit's holding is the law of the case because, even though it arose from a preliminary injunction decision, the Sixth Circuit had a fully developed record and was not under any time constraints when it issued its second opinion. *See Daunt v. Benson*, 999 F.3d 299, 308 (6th Cir. 2021) ("[T]he law-of-the-case doctrine may be inapplicable when the legal conclusions in a preliminary-injunction decision were based on an *underdeveloped* record, issued under *time pressures* related to the circumstances of the preliminary injunction at issue, or were otherwise not conclusively decided.") (emphases added) (citation omitted).

Second, besides the law of the case, the previously assigned judge's reliance on exacting scrutiny instead of the *Anderson-Burdick* framework was a clear legal error. *Moody v. Mich. Gaming Control Bd.*, 871 F.3d 420, 426 (6th Cir. 2017) (quoting *United States v. Rayborn*, 495 F.3d 382, 337 (6th Cir. 2007)) (reaffirming that the law-of-the-case doctrine does not control when a decision is clearly erroneous). The Court "generally evaluate[s] First Amendment challenges to state election regulations" through the *Anderson-Burdick* framework. *Schmitt*, 933 F.3d at 639. In

fact, "*Anderson-Burdick* applies to a wide array of claims touching on the election process, including First Amendment . . . claims." *Daunt*, 999 F.3d at 314 (citations omitted); *e.g.*, *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 390 (6th Cir. 2020) (challenge to Tennessee's signature verification procedure); *Thompson v. DeWine*, 959 F.3d 804, 808 (6th Cir. 2020) (First Amendment challenge to Ohio's requirements for collecting signatures for ballot initiatives). Plaintiffs' speech and associational claim is a First Amendment challenge to a state election regulation. The *Anderson-Burdick* framework therefore applies.

     *C.*    Anderson-Burdick *Framework*

Under the *Anderson-Burdick* framework, "[l]aws imposing 'severe burdens on plaintiffs' rights' are subject to strict scrutiny, but 'lesser burdens . . . trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'" *Schmitt*, 933 F.3d at 639 (omission in original) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)). The Court must "weigh the burden imposed by the State's regulation against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Thompson* 959 F.3d at 808 (internal quotation marks removed) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) and *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

"Where, as here, the alleged severity of the burdens imposed can be gleaned from the face of the challenged law and [] can be weighed against the asserted state

interests, dismissal on the pleadings is warranted." *Daunt*, 999 F.3d at 313 (citation omitted).

### 1. *Burdens imposed*

Plaintiffs alleged that the absentee-ballot law "impede[s] them from engaging with potential voters in ways that would advance their missions." ECF 121, PgID 1980–81 (citation omitted); *see* ECF 17, PgID 92 ("Priorities USA's mission is to build a permanent infrastructure to engage Americans by persuading and mobilizing citizens around issues and elections that affect their lives."). And that mission is furthered, they argue, by returning completed ballot applications for absentee voters. ECF 121, PgID 1980–81, 1986 n.10. But the absentee-ballot law restricts only possessing completed applications. § 168.759(4). It is silent on all other get-out-the vote efforts. *See id.* Thus, the law would impose no severe restriction on Plaintiffs' First Amendment rights.

Again, Plaintiffs may still distribute blank applications to voters. *See id.* Plaintiffs may also accompany the blank applications with speech that educates the voters about the issues presented on the ballot, about how to register to vote, and about how to properly return the application. *See id.*; *Priorities USA*, 487 F. Supp. 3d at 614. Plaintiffs may answer any questions from voters about the voting process or issues raised on the ballot. *See* § 168.759(4); *Priorities USA*, 487 F. Supp. 3d at 614. Plaintiffs may even *instruct* voters how to fill out their application, ECF 113, PgID 1904, and "provide[] a pool of electors that can return the [applications] for [Plaintiffs] *when requested by voters*," *Priorities USA*, 487 F. Supp. 3d at 614–15 (emphasis in

17

original). *See* § 168.759(4) ("A registered elector who is requested by the applicant to return his or her absent voter ballot application . . . ."). The law merely restricts Plaintiffs from possessing and returning a completed application—the last leg of the absentee-application process. *Id.* That nominal task belongs to the voter. Thus, the absentee-ballot law preserves Plaintiffs' mission to "mobiliz[e] citizens around issues and elections that affect their lives," ECF 17, PgID 92, at every point until the ultimate application return. The absentee-ballot law's restriction on Plaintiffs' speech and associational rights is therefore minimal.

### 2.  *Burdens weighed against State interest*

Put simply, "the absentee ballot process is susceptible to fraud," *Priorities USA*, 487 F. Supp. 3d at 613, and Michigan's interest "in preserving the integrity of its election process" is "indisputably . . . compelling." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (quotation omitted). The absentee-ballot law "is designed with fraud prevention as its aim and it utilizes well-recognized means in doing so." *Priorities USA*, 487 F. Supp. 3d at 614. "[B]y regulating the distribution and collection of absentee ballot applications and limiting those who are permitted to transport the applications, the State increases accountability and protects against instances of carelessness." *Id.* (cleaned up). To compare, "[l]imiting the classes of persons who may handle early ballots to those less likely to have ulterior motives deters potential fraud and improves voter confidence." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2347 (2021). Based on overwhelming binding authority, promoting accountability and encouraging faith in the absentee-voting system is a

18

compelling State interest. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008) ("[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process.").

Michigan's regulatory interests in preserving the integrity of its elections "are not only legitimate, they are compelling." *Thompson*, 959 F.3d at 811 (collecting cases). Weighed against the minimal burden imposed on Plaintiffs, the law survives *Anderson-Burdick*'s "rational-basis plus" standard of review. *Lichtenstein*, ---F. Supp. 3d---, 2021 WL 5826246, at *7, 22 n.18. To confirm, Intervenors asserted that "the absentee-ballot law is Michigan's *only* statute specifically protecting against fraud or abuse in the application process on the front end." ECF 113, PgID 1906 (cleaned up). And the law accomplishes such protections "by encouraging accountability and increasing the chance that persons collecting application[s] for absentee ballots are civic-minded, known to the state, and subject to Michigan's subpoena power." *Id.* (citation omitted). The absentee-ballot law therefore imposes meager burdens that are strictly necessary to achieve the State's interests. *See also Priorities USA*, 487 F. Supp. 3d at 615 ("[T]he [S]tate's interests in preventing fraud and abuse in the absentee ballot application process and maintaining public confidence in the absentee voting process are sufficiently important interests and are substantially related to the limitations and burdens set forth in § 759."). The law thus survives scrutiny under the *Anderson-Burdick* framework. The Court will therefore dismiss the First Amendment challenges to the absentee-ballot law.

III.   Claim Four: VRA Challenge to the Absentee-Ballot Law

Intervenors and Attorney General Nessel argued that the VRA challenge fails for two reasons. ECF 113, PgID 1909–11. One, the absentee-ballot law does not conflict with the VRA. *Id.* at 1909–10. Two, the law relies on injuries from unrelated third parties. *Id.* at 1910–11.

Although the Court allowed the claim to survive the motion to dismiss, *Priorities USA*, 462 F. Supp. 3d at 816,[8] it later reassessed the finding in the preliminary injunction order, 487 F. Supp. 3d at 620. There, the Court found that "[P]laintiffs have not shown a likelihood of success on their bid to overcome the presumption against preemption." *Id.*[9]

The Court will first address why Plaintiffs lack standing to sue based on VRA conflict preemption. The Court will then illustrate why the absentee-ballot law does not conflict with the VRA.

A.   *Standing*

A federal court must assure itself that it has subject-matter jurisdiction over a case. *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1393 (3d ed. 2022). Standing is established when three elements are met. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). First, a plaintiff must show that he or she

---

[8] In that order, the Court found that Plaintiffs lacked standing on two of their claims. *Id.* at 808–09 (dismissing claims three and seven). The Court also implied that Plaintiffs had standing to bring their VRA preemption claim (claim four) because the claim "rel[ies] on their own rights and injuries as organizations." *Id.* at 808. But the Court never completed a standing analysis for that claim. *See id.*

[9] The Sixth Circuit never opined on the VRA challenge to the absentee-ballot law.

"suffered an injury in fact," that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks and citations removed). Second, the plaintiff must show that there is "a causal connection between the injury and the conduct complained of" that is "fairly traceable to the challenged action of the defendant." *Id.* (cleaned up). And third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotation marks and quotation omitted).

"[T]he Supreme Court has permitted organizations to bring suit in VRA claims." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016) (citing *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 268–71 (2015) (relying on associational standing)). But organizations must still meet the three elements of standing to assert a VRA claim. *Id.* (noting that the organization bringing a VRA claim "suffered" from an injury "directly related to" voting laws and that "a favorable decision would redress that injury").

Plaintiffs have failed to show an injury that is actual or imminent, as well as concrete and particularized. Plaintiffs pushed two standing arguments. One, Plaintiffs believed standing is a given because "the Supreme Court has permitted organizations to bring suit in VRA claims." ECF 121, PgID 1988 (quoting *Ne. Ohio Coal. for the Homeless*, 837 F.3d at 624). And two, "the VRA was *intended* to confer standing to organizations like Plaintiffs . . . [who] represent[] the interests of injured persons." *Id.* (emphasis in original) (quoting S. Rep. No. 94-295, at 40 (1975)). Neither

argument, however, explains how Plaintiffs have suffered, or will suffer, an injury sufficient to establish standing.

First, although organizations may have standing to bring VRA claims, the Sixth Circuit has clarified that those organizations must have shown injuries beyond "simply the effort and expense associated with [interacting] with voters." *Ne. Ohio Coal. for the Homeless*, 837 F.3d at 624 (quotation omitted). They must instead allege a concrete injury like "an overhaul of the get-out-the-vote strategy of an organization that uses its limited resources helping [certain classes of] voters cast ballots." *Id.* And an organization "has standing to bring suit on behalf of its members *when its members would otherwise have standing to sue in their own right*, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (emphasis added) (citation omitted).

Plaintiffs vaguely asserted that they have standing to bring the VRA challenge because they represent the interests of voters who may be affected by the absentee-ballot law. ECF 121, PgID 1988–89. Put another way, Plaintiffs appeared to suggest that standing is a given simply because they represent the interests of voters. But the argument fails to even allege the simple "effort[s] and expense[s] associated with [interacting] with voters," let alone a concrete injury such as "an overhaul of the get-out-the-vote strategy of an organization that uses its limited resources helping [certain classes of] voters cast ballots." *Ne. Ohio Coal. for the Homeless*, 837 F.3d

22

at 624. Even in their representative capacity, Plaintiffs must still allege a concrete injury. *See Ala. Legis. Black Caucus*, 575 U.S. at 268–71.

And Plaintiffs have offered no such allegations of a concrete injury. *See* ECF 17, PgID 118–21; *see also* ECF 113, PgID 1910 ("Plaintiffs rest [claim four] exclusively on claimed injuries to individuals not even presently identifiable.") (quotation marks and quotation omitted); ECF 121, PgID 1987–90 (no response to Legislative Intervenors' argument about identifiable individual injuries). Plaintiffs have therefore failed to show an injury as to their organizations, and they have failed to show any injury as to the voters whose interests they claim to represent.

Plaintiffs' second argument that "the VRA was intended to confer standing to organizations like Plaintiffs" fares no better. ECF 121, PgID 1988 (emphasis omitted). Admittedly, the Senate report for the 1975 VRA amendments stated that "[a]n 'aggrieved person' is any person injured by an act of discrimination. It *may be* an individual or an organization representing the interests of injured persons." S. Rep. No. 94-295, at 40 (emphasis added) (citing *Trafficante v. Metropo. Life Ins. Co.*, 409 U.S. 205 (1972) and *NAACP v. Button*, 371 U.S. 415 (1963)). But Plaintiffs have not shown that any person whose interests they represent has been injured. *See* ECF 121, PgID 1987–90. Again, Plaintiffs' representative status alone does not carry them over the standing threshold. Besides, Supreme Court precedent, Sixth Circuit precedent, and enacted statutes bind the Court—not the findings in a Senate report. Any value of the Senate report is indeed persuasive, but it cannot spawn a

constitutional basis for standing here. In all, Plaintiffs lack standing to bring the VRA challenge to the absentee-ballot law.

      B.    *Conflict Preemption*

Even if Plaintiffs had established standing, the claim would have still failed because the VRA does not preempt the absentee-ballot law. Admittedly, the Court grounded its reassessment of preemption on the preliminary injunction standard. *See Priorities USA*, 487 F. Supp. 3d at 608. But the Court's finding rested on legal reasoning, such as interpreting the VRA's text, *id.* at 619, and examining legislative history, *id.* at 619–20. And even when the Court did look at evidence outside the complaint, the evidence did not alter any of its legal conclusions. *Id.* at 620. Thus, the Court can easily "glean[] from the face of the challenged law" whether the VRA preempts the absentee-ballot law. *Daunt*, 999 F.3d at 313. And courts routinely resolve conflict preemption claims at the Rule 12(b)(6) stage. *E.g.*, *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319–20 (6th Cir. 2017) (holding that the Telecommunications Act of 1996 preempted the State law claims); *Allen v. Spirit Airlines, Inc.*, 981 F. Supp. 2d 688, 691–99 (E.D. Mich. 2013) (finding that the Federal Aviation Act preempted the State law claims).

"Federal law may preempt state law expressly or implicitly." *Torres v. Precision Indus., Inc.*, 995 F.3d 485, 491 (6th Cir. 2021) (per curiam) (citation omitted). Relevant here is conflict preemption—an implied federal preemption issue. *Priorities USA*, 487 F. Supp. 3d at 618–19.

24

Conflict preemption "applies when federal and state laws conflict in a way that would make compliance with both impossible, or when the state laws 'interfere with the operation of the federal program.'" *Torres*, 995 F.3d at 491 (alteration omitted) (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 604 (2011)). The latter situation applies here. *Priorities USA*, 487 F. Supp. 3d at 618–19. The Court must therefore consider whether the absentee-ballot law would cause the VRA's "operation [to] be frustrated and its provisions [to] be refused their natural effect." *Torres*, 995 F.3d at 492 (alterations in original) (quoting *Chrysler Grp. LLC v. Fox Hills Motor Sales, Inc.*, 776 F.3d 411, 424 (6th Cir. 2015)).

Plaintiffs first stressed that "the Court should not engage in th[e] fact-specific inquiry [of whether to preempt state election laws] until a later stage in this litigation, after the parties have had the opportunity to develop the factual record." ECF 121, PgID 1287. But whether Section 208 of the VRA preempts the absentee-ballot law is a pure legal question. *See Mich. Consol. Gas Co. v. Panhandle E. Pipe Line Co.*, 887 F.2d 1295, 1299 (6th Cir. 1989) (acknowledging how the federal preemption analysis of the Natural Gas Act was a question of law) (citation omitted). And Plaintiffs recognize as much. ECF 25, PgID 359. It follows that the issue is ripe for the Court's consideration at the present litigation stage. *E.g.*, *Robbins*, 854 F.3d at 319–20; *Allen*, 981 F. Supp. 2d at 691–99.

Plaintiffs next claimed that Section 208 conflicts with the absentee-ballot law's text. ECF 121, PgID 1989–90. Under Section 208, "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may

25

be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. As Plaintiffs put it, the absentee-ballot law "unlawfully limits the rights afforded to voters by Section 208 by prohibiting voters who need help returning their absentee ballot applications from receiving assistance from the person of their choice." ECF 17, PgID 119–20.

But Plaintiffs read the VRA too broadly. Section 208 allows certain voters who need help voting to select "*a* person of the voter's choice"—not '*any* person,' not '*the* person.' 52 U.S.C. § 10508 (emphasis added); *see also Priorities USA*, 487 F. Supp. 3d at 619. The wording matters. An indefinite article ("a") "is non-specific and nonlimiting, as opposed to the definite article" ("the"), which "is specific and limiting." *Priorities USA*, 487 F. Supp. 3d at 619 (dictionary citations omitted).[10] Thus, when Congress "has declined to use a definite article, its language suggests that some state law limitations on the identity of persons who may assist voters is permissible." *Id.* In other words, a State law that limits a voter's choice does not automatically flout Section 208.

Nor does it frustrate "the natural effect" of Section 208. *Torres*, 995 F.3d at 492. To fend off that conclusion, Plaintiffs acknowledged that Section 208 "uses the indefinite article 'a' before 'person of the voter's choice.'" ECF 121, PgID 1989. But Plaintiffs countered that the statute "then lists *specific persons* who cannot assist the

---

[10] No party suggested that the meanings of "a" or "the" have changed from when Congress amended the VRA in 1975.

voter, namely 'the voter's employer or agent of that employer or officer or agent of the voter's union.'" *Id.* (emphasis in original). To Plaintiffs, "[i]t is far from clear that Congress would provide two express limitations on who may assist voters if it intended to imply a host of other limitations as well." *Id.* (citation omitted).

Yet Congress agreed to use an indefinite article, meaning that the persons identified in Section 208 do not constitute an exhaustive or exclusionary list. As explained, an indefinite article is inherently "non-specific and nonlimiting." *Priorities USA*, 487 F. Supp. 3d at 619. At its core, Section 208's natural effect allows some wiggle room: a voter may select "a person" to assist them, but not *the* person of their choice. 52 U.S.C. § 10508. And Michigan's absentee-ballot law limits that person to "a member of the applicant's immediate family; a person residing in the applicant's household; a person whose job normally includes the handling of mail . . .; a registered elector requested by the applicant to return the application; or a clerk, assistant of the clerk, or other authorized election official." Mich. Comp. Laws § 168.759(4). Thus, the two laws are harmonious and the VRA does not preempt the absentee-ballot law. The preemption challenge thus lacks merit, and the Court will dismiss it.

IV.   <u>Claim Five: Vagueness and Overbreadth Challenges to the Voter-Transportation Law</u>

Intervenors and Attorney General Nessel moved to dismiss the vagueness and overbreadth challenges because "a person of ordinary intelligence would readily understand" the law. ECF 113, PgID 1899–902. The Court allowed the claim to survive the motion to dismiss because Attorney General Nessel had raised a new

27

limiting construction argument in the reply brief. *Priorities USA*, 462 F. Supp. 3d at 818. The Court noted that resolving the challenge was therefore "best left addressed in the context of the parties' pending motion for preliminary injunction." *Id.* Put differently, the limiting construction argument was not properly asserted at the motion to dismiss stage. *Id.* ("The [C]ourt will not, however, address an issue raised for the first time in the reply.") (citation omitted). And in the preliminary injunction order, the Court found the law "to be relatively straightforward and unambiguous." *Priorities USA*, 487 F. Supp. 3d at 621. For similar reasons, the Court will dismiss claim five.

A statute is unconstitutionally vague under the Fourteenth Amendment "for either of two independent reasons." *Hill v. Colorado*, 530 U.S. 703, 723 (2000). "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.* (citation omitted).

Federal courts must construe a challenged State statute, whenever possible, "to avoid constitutional difficulty." *Green Party of Tenn. v. Hargett*, 700 F.3d 816, 825 (6th Cir. 2012) (quotation omitted). That requirement therefore requires federal courts to adopt any reasonable construction. *Id.* (citing *Chapman v. United States*, 500 U.S. 453, 464 (1991)). As a result, a statute is "facially vague only if [a] plaintiff [] demonstrate[s] that the law is impermissibly vague in *all* of its applications." *Id.* (emphasis added) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982)).

28

Federal courts read words in a statute based on their ordinary meaning at the time of a statute's enactment. *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (quotation omitted). Contemporaneous dictionaries "are the best" starting place for interpreting words. *Keen v. Helson*, 930 F.3d 799, 802–03 (6th Cir. 2019); *see also Wis. Cent. Ltd.*, 138 S. Ct. at 2071 (relying on dictionary definitions to begin interpreting a statute). The Court must also consider the placement of the words in the overall statutory scheme. *Keen*, 930 F.3d at 803 ("[T]he structure and wording of other parts of a statute can help clarify the meaning of an isolated term.") (citation omitted); *see also Wis. Cent. Ltd.*, 138 S. Ct. at 2071 ("The broader statutory context points to the same conclusion the immediate text suggests.").[11]

The Court read the voter-transportation law to mean, "[i]n a nutshell, no person (including a corporation) may pay wages or make any other payment to another to transport voters to the polls, unless the person so transported cannot walk." *Priorities USA*, 487 F. Supp. 3d at 621. "Thus, . . . a corporation is limited to providing transportation for voters who can walk through means that do not involve payment to the person doing the transporting." *Id.*

Plaintiffs asserted that the term "hire" renders the law unconstitutionally vague because "it remains unclear precisely what conduct can result in criminal

---

[11] Michigan's statutory interpretation principles track how federal courts interpret statutes. *See Manuel v. Gill*, 481 Mich. 637, 650 (2008) ("A court does not construe the meaning of statutory terms in a vacuum. Rather, we interpret the words in their context and with a view to their place in the overall statutory scheme.") (cleaned up); *Kent Cnty. Aeronautics Bd. v. Dep't of State Police*, 239 Mich. App. 563, 578 (2000) (The Court "may consult dictionary definitions to determine the plain and ordinary meaning of a word.") (citation omitted).

prosecution." ECF 121, PgID 1991. But in the context of the sentence and the section as a whole, the term 'hire' is unambiguous. *See Wis. Cent. Ltd.*, 138 S. Ct. at 2070.

To start, the Michigan legislature did not define "hire," *see* § 168.2, so the Court will consult dictionary definitions. *See Keen*, 930 F.3d at 802–03. Black's Law Dictionary consistently defines "hire" as "[t]o engage the labor or services of another for wages or other payment." (9th ed. 2019); *e.g.*, *Hire*, Black's Law Dictionary (6th ed. 1991) ("To purchase the temporary use of a thing, or to arrange for the labor or services of another for a stipulated compensation.").[12] In context, therefore, the term "hire" proscribes making a payment—whether in the form of wages or otherwise—to another for driving voters (except those physically unable to walk) to an election poll.[13] And that reading fits with the section's main goal to "prohibit[] conduct" related to "valuable consideration." § 168.931(1)(f); § 168.931(4) (defining "valuable consideration" as "money, property," among other items); *see also Priorities USA*, 978 F.3d at 984 ("Michigan's ban on paid voter transportation is one provision among several others in the statute intended to prevent fraud and undue influence."). It follows that the plain meaning of "hire" is not only clear on its own, but also fits within the statute's overall structure.

---

[12] No party suggested that the meaning of the term "hire" has changed since the law's original enactment in 1895 until the law's most recent amendment in 1982. *Cf. Priorities USA*, 978 F.3d at 984 n.2, 985 (discussing amended language).

[13] The statute defines "election" as "an election or primary election at which the electors of this state or of a subdivision of this state choose or nominate by ballot an individual for public office or decide a ballot question lawfully submitted to them." § 168.2(g).

What is more, the Sixth Circuit never suggested the law was vague. *See Priorities USA*, 978 F.3d at 983–84 (discussing the voter-transportation law's historical context). And the Court even acknowledged that the voter-transportation law was "relatively straightforward and unambiguous."[14] *Priorities USA*, 487 F. Supp. 3d at 621.

Still, Plaintiffs suggested that under a hypothetical reading, the law would bar them from contracting with ride-sharing companies like Uber to transport a voter. ECF 121, PgID 1990–91. But the Uber hypothetical does not conjure up a vague reading of the statute. Indeed, "in determining whether a law is facially invalid, [the Court] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–50 (2008) (citation omitted). The Court need only adopt *any* reasonable construction. *Green Party of Tenn.*, 700 F.3d at 825 (quotation omitted). All told, the law's meaning is clear: Plaintiffs cannot pay someone—whether in the form of wages or otherwise—to drive voters (except those physically unable to walk) to an election poll. *E.g.*, *Priorities USA*, 487 F. Supp. 3d at 621 ("Thus, . . . a corporation is limited to providing transportation for voters who can walk through means that do not involve payment to the person doing the transporting.").

---

[14] Although the Court made that legal finding during its preemption analysis, Plaintiffs offered no argument for why the ruling cannot apply to the vagueness analysis. *See* ECF 121, PgID 1991–92.

Last, Plaintiffs raised no overbreadth argument in their response brief. *See* ECF 121, PgID 1990–92. Instead, Plaintiffs argued that their "vagueness and overbreadth challenge" asked "whether [the law] 'fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests.'" *Id.* at 1990 (quoting *City of Chi. v. Morales*, 527 U.S. 41, 52 (1999)). But the standard Plaintiffs cited applies only to vagueness challenges. *Morales*, 527 U.S. at 52. At any rate, the overbreadth challenge fails because the voter-transportation law has a "plainly legitimate sweep." *Id.* at 52 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612–15 (1973)); *see also Crawford*, 553 U.S. at 202 (same standard). It protects against "vote-hauling," a common election-fraud phenomenon. *Priorities USA*, 978 F.3d at 983–84 (collecting sources). The voter-transportation law "is not substantially overbroad[,] and [] whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations," *Broadrick*, 413 U.S. at 615–16, rather than voiding the law in full. The Court will therefore dismiss claim five.

V.   Claim Six: Speech and Associational Challenges to the Voter-Transportation Law

Intervenors and Attorney General Nessel asserted that the First Amendment challenge to the voter-transportation law fails under the *Anderson-Burdick* framework. ECF 113, PgID 1902–04, 1907–08. And the previously assigned judge had applied exacting scrutiny to that claim in the motion to dismiss order. *Priorities USA*, 462 F. Supp. 3d at 818–19. But as analyzed above, the Sixth Circuit instructed the Court to apply the *Anderson-Burdick* framework to the voter-transportation law.

*Priorities USA*, 860 F. App'x at 422 n.3. Applying the *Anderson-Burdick* framework thus corrects the clear legal error of applying exacting scrutiny to the voter-transportation law. Plaintiffs in fact believe that the Court must apply the same legal standard to the absentee-ballot and voter-transportation laws. *Priorities USA*, 462 F. Supp. 3d at 816. The *Anderson-Burdick* framework therefore applies here. The Court will first address the burdens the voter-transportation law imposes and then weigh those burdens against Michigan's interests.

A.   *Burdens Imposed*

The Sixth Circuit held that "Michigan's law requiring get-out-the-vote organizers to get people to the polls other than by hired vehicle does not appear to pose an unconstitutional burden." *Priorities USA*, 860 F. App'x at 422 n.3. The Court agrees. "The hallmark of a severe burden is exclusion or virtual exclusion from the ballot." *Schmitt*, 933 F.3d at 639 (quotation omitted); *see also Priorities USA*, 860 F. App'x at 422 n.3 ("The Michigan statute is likely not a severe burden on their rights because it does not appear to result in 'exclusion or virtual expulsion' from the ballot.") (quotation omitted).

The voter-transportation law limits only one of countless ways Plaintiffs could bring voters to the polls. To be sure, the law bars Plaintiffs from transporting only one class of voters (those who can walk) to the polls. § 168.931(1)(f). It falls well short of excluding or virtually excluding those voters from accessing the polls. As a result,

the law's burden is minimal. *See Schmitt*, 933 F.3d at 641 ("[B]urden is minimal when it 'in no way' limits access to the ballot.") (quotation omitted).[15]

Even if the Court were to look only at the law's burden on Plaintiffs' "communications with and assistance to voters," ECF 121, PgID 1286 n.10, that burden is still minimal. The narrow law bars only a person from "hir[ing] a motor vehicle . . . for conveying voters, other than voters physically unable to walk, to an election." § 168.931(1)(f). The law allows all sorts of communications that Plaintiffs may have with voters. *See id.* Again, the law proscribes only *one* kind of assistance to a *precise* class of voters—paying to drive voters who can physically walk to the polls.[16] *Id.*; *e.g.*, *Priorities USA*, 487 F. Supp. 3d at 621. The Court need not recite the litany of permissible methods that Plaintiffs may use to assist voters. In sum, no matter how the Court evaluates the law's burdens on Plaintiffs or the voters that they want to assist, those burdens are minimal.

B.    *Burdens Weighed Against State Interest*

Michigan's "interest in preventing potential voter fraud is an important regulatory interest." *Priorities USA*, 860 F. App'x at 422 n.3 (citation omitted); *see also Crawford*, 553 U.S. at 196 ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."). At its core, the voter-transportation law targets vote-hauling, which "can be a classic

---

[15] Not to mention, the Sixth Circuit agreed that Plaintiffs did "not seem likely to shoulder th[e] heavy burden [of persuasion]" required to "seek[] relief that would invalidate the statute in all its applications." *Priorities USA*, 860 F. App'x at 422 n.3.
[16] The law does not even restrict Plaintiffs from paying to drive "voters physically unable to walk[] to an election." *Id.*

form of bribery—paying a voter to 'haul' himself or herself . . . to the polls to vote." *Priorities USA*, 978 F.3d at 983. The law thus supports Michigan's important regulatory interest in deterring fraud at the polls (vote-hauling) and securing the public's confidence in election outcomes. *See* § 168.931(1)(f); *Priorities USA*, 978 F.3d at 984.

In the end, the State's interests in preserving the integrity of its elections "are not only legitimate, they are compelling." *Thompson*, 959 F.3d at 811 (collecting cases). Weighed against the minimal burden imposed on Plaintiffs, the law is a reasonable, nondiscriminatory restriction justified by its fraud-prevention interest. The voting-transportation law therefore survives *Anderson-Burdick*'s "rational-basis plus" standard of review. *Lichtenstein*, ---F. Supp. 3d---, 2021 WL 5826246, at *7, 22 n.18. The Court will thus dismiss claim six.

## CONCLUSION

Because the Court will grant the Rule 12(c) motions from the Republican Intervenors, the Legislative Intervenors, and Attorney General Nessel, no claims remain. The Court will therefore deny the remaining pending motions as moot. The Court will also order the Clerk of the Court to strike ECF 157 because it contains the proposed amicus brief from Uber, *id.* at 5949–72.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that the motions for judgment on the pleadings [113; 115] are **GRANTED**.

**IT IS FURTHER ORDERED** that the pending motions [148; 149; 150; 152; 153; 154; 155; 157] are **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that the Clerk of the Court must **STRIKE** ECF 157.

This is a final order that closes the case.

**SO ORDERED.**

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: September 15, 2022

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 15, 2022, by electronic and/or ordinary mail.

s/ David P. Parker
Case Manager